Vincent G. DOYON, Petitioner, Appellant,

v.

Allan L. ROBBINS, Warden, et al., Respondents, Appellees.

No. 6105.

United States Court of Appeals
First Circuit.

Heard June 4, 1963.

Decided Sept. 6, 1963.

F. Lee Bailey, Boston, Mass., for appellant.

John W. Benoit, Asst. Atty. Gen., with whom Frank E. Hancock, Atty. Gen., was on brief, for appellees.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

WOODBURY, Chief Judge.

This is an *in forma pauperis* appeal on certificate of probable cause from an

order of the United States District Court for the District of Maine denying a petition for *habeas corpus*. The question presented is whether the petitioner was deprived of due process of law by the admission of his signed confession into evidence at his trial by jury in the Superior Court of the State of Maine for murder.

The petitioner's contention in the court below, at his trial and in *coram nobis* proceedings thereafter, is that his confession was constitutionally inadmissible because it was made and signed while he was so far under the influence of alcohol that it was not "the product of a rational intellect and a free will." Townsend v. Sain, 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963), and cases cited. The court below denied the petition without hearing, saying that the entire record of state proceedings was before it and that it was satisfied by its examination of the record of those proceedings that the state courts had given fair and adequate consideration to the issues raised by the petitioner and that "the ends of justice would not be served by a retrial of those issues here."

The following historical facts were clearly established by the State's evidence including the petitioner's confession and were either admitted or not disputed by the petitioner, who took the stand in his own defense.[1]

The petitioner was 36 years old at the time of his trial in October 1959, and although he had attended high school for only about six months, he acquired full high school credits while serving as a sergeant in the Army during World War II. He returned to military service during the Korean crisis and was selected for Officer's Candidate School, from which he was graduated with the rank of Second Lieutenant. He subsequently left the Army with the rank of First Lieutenant. In 1943 he married but by 1959 he had been divorced for desertion and was living in Portland, Maine, with another woman by whom he had an infant child.

On August 10, 1959, the petitioner appeared in the Superior Court in Augusta, Maine, in answer to a demand by his divorced wife for support payments for their 12-year-old daughter. He elected to appear without counsel, saying in his testimony at his trial that he felt competent to handle his case himself although he had never been in court before. The court after hearing awarded the ex-wife $50 per week and impressed upon the petitioner that non-compliance with the order would be dealt with severely. This stunned and angered the petitioner because he was earning only $90 a week, was heavily in debt and felt under obligation to support the woman with whom he was living and their child. After the court hearing the petitioner had a light lunch and then started drinking beer. He spent the afternoon in Augusta, his birthplace and where he had lived most of his life, drinking beer and pouring out his woes to relatives and any friends and acquaintances who would listen. Toward evening he bought a pint of whiskey, and about 6:15, after closing time, joined two friends in the back room of a local hardware store which they owned. He and his friends shared some part of the petitioner's whiskey and a pint of their own, but the quantity consumed by the petitioner is unknown.

About 9 o'clock, the petitioner drove his car to the apartment of a married sister who lived in Augusta in the same neighborhood as his ex-wife. After visiting briefly with his sister and brother-in-law, he returned to his car, removed a nine-shot revolver from the trunk, loaded it, put it in his pocket and either drove or walked, the evidence as to this detail is not clear, the two or three city blocks to the building where his ex-wife lived in a second floor apartment. Petitioner knocked on the door of his ex-wife's apartment and was admitted. After a

---

1. The petitioner did not deny the statements attributed to him in his confession but asserted that at the time he was so intoxicated that: "I don't know what I said. I could have said anything."

few words, during which the ex-wife stamped on the floor as the prearranged signal to call their 12-year-old daughter, who was visiting with a friend downstairs, the petitioner drew the revolver and began shooting at his ex-wife. The daughter, who had arrived in the meantime, tried to restrain her father, but failed, and the ex-wife fled downstairs. The petitioner followed, shooting as he went, and his ex-wife fell dead at the foot of the stairs.

The petitioner then returned to his sister and brother-in-law's apartment, reloading his revolver on the way. He told his brother-in-law to send his children out of the room, which he did, and the petitioner then announced that he had just shot his ex-wife. His sister went at once to the ex-wife's apartment. His brother-in-law wrested the revolver from the petitioner, presumably to avert suicide, and then followed his wife. Finding a police captain, a police officer and the sheriff already there, the brother-in-law returned with them to his apartment. When they entered the petitioner was talking on the telephone with the woman in Portland with whom he was living, but hung up when his brother-in-law and the police entered. The police, after a brief, but fierce, tussel, took the petitioner into custody and then drove him to police headquarters, where they removed his handcuffs and he was interrogated.

The interrogation took place in a back room at the police headquarters which was simply furnished and without bright lights or any apparatus suggestive of physical duress or intimidation. Most of the examination was conducted by an assistant county attorney, although information and some questions were interjected by the sheriff and the police captain, based upon their investigations at the scene of the shooting and their participation in the petitioner's arrest. A tape recording of substantially all of the oral examination was made by the sheriff.

Toward the end of the oral interrogation, the petitioner consented to the taking of a blood sample, that the alcohol content might be determined, and then he agreed to have his statement put in writing. A typewriter was brought in and the assistant county attorney wrote down what the petitioner told him. It was not strictly a dictated statement, for much of what the petitioner said was in response to the county attorney's questions; and the attorney omitted those portions of the petitioner's statement which he regarded as irrelevant. The net result was a single page of single-spaced typewriting which adumbrates petitioner's version of the day's events.

Apart from the admission that he shot and killed his ex-wife, which petitioner has never denied, the confession contained statements highly relevant to another essential element of the crime of murder, namely, evidence of premeditation. Thus, he says in his confession that he told another sister, whom he visited in the early afternoon before he started drinking, that: "I would take my former wife for a trip with me." And with reference to his afternoon's drinking activities he says, "I told people 'She's gonna pay, she's gonna pay.'" And finally, after being admitted to his ex-wife's apartment, he states that his ex-wife said in connection with the court proceedings of that morning, "You didn't think they could do it, but they did," to which he says he replied, "You didn't think I was gonna do this either," and then drew his revolver.

Petitioner was handed the typed statement, and after holding it a moment (he later claimed he just glanced at it, but others present said he appeared to read it) he signed the statement with an obviously steady hand.

The petitioner was indicted in due course for murder (there are no degrees of murder or manslaughter in Maine), and in October 1959 he went to trial in the Superior Court of the State of Maine for Kennebec County. At that trial he was represented by obviously competent counsel of his own choice, and, as already appears, he took the stand in his own defense. On the stand the petitioner admitted that he went to his ex-wife's

apartment armed with a loaded revolver and there shot and killed her, although he professed little if any recollection of his movements after leaving his friends at the hardware store. The issue litigated was the state of the petitioner's mind with respect to his consumption of alcohol at the time of the killing with particular reference to the presence of "premeditation" or "malice aforethought." That is to say, the petitioner admitted the killing but did not assert his voluntary intoxication in complete defense but only to reduce the crime for which he might be found guilty from murder to manslaughter.

On this issue the State introduced evidence of remarks showing premeditation made by the petitioner to friends and relatives during the afternoon preceding the shooting, when the petitioner by his own admission was not intoxicated, such as: "He said he was going to take his wife for a ride and put her six feet under ground." And the State also offered in evidence both the tape recording and the written confession made at the police station in Augusta soon after the crime. The tape recording was excluded on objection of petitioner's counsel. Counsel's objection to the admission of the confession on the clearly stated ground that at the time it was obtained the petitioner was in a state of intoxication amounting to "mania," see Mergner v. United States, 79 U.S.App.D.C. 373, 147 F.2d 572 (1945), and cases cited, was overruled, and the court in accordance with local practice, State v. Robbins, 135 Me. 121, 190 A. 630 (1937), submitted the question of its voluntariness to the jury. On this issue the court charged:

"If you decide the statements were made, * * * then before you would give them weight you would have to decide whether the statements were made voluntarily. * * * You would ask yourselves, if these statements were made were they made under duress because of threats or fear, or promises, or any other forces which were present which would prevent the statements from being the freely spoken explanations of the respondent? What was the respondent's condition as to intoxication? Did the use of alcohol affect the mind of the respondent so that the statements were obtained only because his will was destroyed by the consumption of alcohol? * * If the statement was not made voluntarily then you would not consider it, and if admissions were not made voluntarily you would not consider them or give them any weight, but if the statements and admissions were made voluntarily and freely, as I have said, then you would evaluate them."

And later, in charging that under the law of Maine intoxication at the time of the killing would be no defense, the court expressly limited the relevancy of the intoxication evidence to the question "whether his admission was voluntary."

 The jury returned a verdict of guilty of murder as charged, and the court in accordance with the law of Maine, which does not impose capital punishment, sentenced the petitioner to imprisonment for life. The petitioner did not appeal.[2]

Subsequently, in November 1960, the petitioner, acting *pro se*, filed a writ of error *coram nobis* in the Superior Court of the State of Maine for Kennebec County. In it he asserted three errors at his trial: first, that the admission of his confession violated his constitutional right to due process of law, second, that the prosecution had knowingly used perjured testimony to obtain his conviction, and third, that the prosecution had withheld evidence to the petitioner's prejudice.

2. The petitioner's failure to appeal does not prevent him in federal *habeas corpus* proceedings from questioning the admissibility of his confession on federal constitutional grounds, for a forfeiture of state remedies does not legitimize unconstitutional conduct by which a conviction was procured. Fay v. Noia, 372 U.S. 391, 428, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

At the outset of the hearing on the writ in February 1961, the court denied petitioner's first assertion of error because in its view "the crux" of petitioner's complaint was the use of perjured testimony and the withholding of evidence, and not the question of the admissibility of the statement at the trial. However, finding that the tape recording had bearing upon the petitioner's allegation of known use of perjured testimony in that it might disclose that the petitioner's condition with respect to intoxication was not what prosecution witnesses had said it was, the court admitted the tape recording in evidence. The court then was at pains to elicit from the petitioner that all he intended to offer in support of his first assertion of error was the tape recording. Having the tape recording before it, the court announced that in spite of its earlier ruling it would consider the petitioner's first claim "in the light of what you have produced here" but did so only to reject it on the ground that the evidence demonstrated that the admissibility of the confession had been fully litigated at the trial and that it was not the function of *coram nobis* to review matters known and raised at the time of trial and reviewable on appeal. Dwyer v. State, 151 Me. 382, 120 A.2d 276 (1956). The court found no evidentiary support for the petitioner's second and third assertions of error at the trial and dismissed his writ of error *coram nobis*.

Petitioner's appeal to the Supreme Judicial Court of the State of Maine was denied. Doyon v. State, 158 Me. 190, 181 A.2d 586 (1962), cert. denied 371 U.S. 849, 83 S.Ct. 85, 9 L.Ed.2d 84 (1962). In a fully considered opinion the Supreme Judicial Court, or Law Court as it is called, said that the "nature and course" of the petitioner's interrogation as well as his "mental state and degree of sobriety" had been "fully explored" at the trial on the issue "whether the alleged confession was voluntarily given without coercion and under circumstances such as to make it properly admissible." The court next noted that although both the petitioner and his counsel had listened to the tape recording and knew its contents before successfully objecting to its admission in evidence at the trial, nevertheless, now, in the *coram nobis* proceeding, the petitioner sought to rely on the tape recording in support of his assertion that the admission of his confession at his trial violated his constitutional rights. With respect to this inconsistency the court said:

"It is now apparent that appellant relies almost entirely upon the contents of the tape recording to support his allegations. Even if the transcribed conversation tended to cast any doubt on the voluntariness of the confession, which it clearly does not, its attempted use for that purpose at this stage would come too late. It is not the purpose of a writ of error coram nobis to re-try issues which were tendered and fully tried prior to conviction. Nor is it a device by which the respondent may reconsider his earlier decisions as to what evidence to offer in his own behalf and what evidence to seek to exclude from consideration by the jury. * * * The appellant cannot be permitted to blow hot and cold as to the use of the tape recording and we emphasize again the fact which seems to us decisive that appellant and his counsel were fully cognizant of all that would be revealed by the recording *before* their objection was entered to its admission in evidence at the original trial and *before* the evidence was closed and they had lost their own opportunity to offer it."

Nevertheless, making allowance for the fact that Doyon lacked legal training and noting that the Superior Court justice had ascertained that Doyon had submitted all the evidence he thought relevant to his first claim of deprivation of constitutional rights and had in fact passed on that claim, the Law Court said:

"We have, however, appraised all of the evidence before us and find no support for the assertions of the appellant. The State's witnesses at

the trial expressed the opinion that appellant was during his interrogation under the influence of intoxicating liquor but not intoxicated, that he was angry as a result of the unfavorable decision of the court that morning but not remorseful over the homicide, and that he was nervous, tense and agitated but nevertheless cooperative rather than hostile. The tape recording supports this summation of the condition and attitude of the appellant. He gave a comprehensive and coherent account of the events of the day. The clarity of his memory and ideas was not that of an intoxicated man. His vocabulary was more than adequate and the choice of words his own. * * * At the point of the actual preparation of the typewritten confession, the appellant did not 'dictate' it in a narrow and technical sense. The bare essentials of his activities as he had related them were put in sentence form by the assistant county attorney and were submitted sentence by sentence to the appellant for his approval. Nothing appears in the signed confession which had not been·first voluntarily related by the appellant. Nothing was omitted which could have benefited the appellant or which he desired to have included. The confession was a fair and truthful short summation of a much longer narration by the appellant."

We have set out the proceedings in the state courts in detail, first, because the court below on the authority of Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953), relied upon the record of those proceedings to deny the petitioner an evidentiary hearing, and second, because we must re-evaluate those proceedings in the light of Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), which came down after the decision of the court below.

The district court, taking the law as it stood at the time, applied the "vital flaw" or "other unusual circumstances"

test of Brown v. Allen to the state factfinding process and finding neither present ruled that it was not the function of federal habeas corpus to give the petitioner another evidentiary hearing. The Court in Townsend v. Sain, however, said 372 U.S. at pages 312 and 313, 83 S.Ct. at page 757 that the "exceptional circumstances" and "vital flaw" tests of Brown v. Allen did "not serve adequately to explain the controlling criteria for the guidance of the federal habeas corpus courts," and said:

"The appropriate standard—which must be considered to supersede, to the extent of any inconsistencies, the opinions in Brown v. Allen—is this: Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding. In other words a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts."

And then the Court held that a federal court must grant an evidentiary hearing to an applicant for habeas corpus under the following circumstances:

"If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing."

Before turning to the crucial issue in this case it is well to point out that we are not here concerned with an inexperienced youthful offender as in Haley v.

Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), or with one of subnormal mentality as in Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957). The petitioner is an intelligent, experienced man in the prime of life with no record of mental illness, cf. Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960), or even of emotional instability. There is not the slightest suggestion of police brutality, as in Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936). Indeed, it appears that the petitioner's handcuffs were removed as soon as he arrived at the police station because he complained that they were too tight. Nor are we concerned with only slightly more subtle police methods, such as prolonged interrogation by officers acting in relays, Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), or deprivation of sleep or food. Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed. 2d 948 (1961), and Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958). On the contrary, the petitioner was interrogated promptly and only long enough for him to tell his story and have it written down. Neither are we concerned with the use by the police of psychiatric techniques, as in Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L. Ed. 948 (1954), or of fraud or deception, such as betrayal by a trusted friend as in Spano v. New York, supra, or beguiling by false assertions or promises as in Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963).

Neither are we concerned with the ingestion at a known time before confession of a specific quantity of a drug having the medically predictable property of a "truth serum" as in Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed. 2d 770 (1963). The petitioner said that during the afternoon he drank ten or twelve twelve-ounce bottles of beer after which he said: "I was not under the influence," followed, between approximately 6:15 and 8:45, by the consumption of an unknown quantity of whiskey which, the petitioner said, deprived him of any substantial memory of what took place, except the shooting, until he awoke in jail the next morning.

The relevant factual question here is the petitioner's condition with respect to the consumption of alcohol at the time of his interrogation and confession. More specifically, it is whether the petitioner had consumed so much alcohol so soon before his confession that his statement was not "the product of a rational intellect and a free will."

The evidence bearing on the petitioner's condition when he confessed was fully developed at the trial. Several witnesses testified that the petitioner was not "drunk" at the conclusion of his afternoon beer-drinking activities. Indeed we have the petitioner's word that he was "not under the influence" at that time. His condition at the conclusion of his visit to the hardware store was described by one of his drinking companions as a "high jag." The petitioner's brother-in-law testified that when he saw the petitioner before the killing about 9 o'clock he was highly upset and enraged over the morning's proceedings and admitted that he had told the petitioner to "sober off." Indeed, he admitted that he had never seen the petitioner showing the effects of liquor more than that night. But the brother-in-law also said: "I have never seen him drunk in my life. I know he can hold quite a load because I have had a few drinks with him myself." And the brother-in-law's father, who was present at the time, testified that the petitioner "didn't act drunk."

The petitioner's 12-year-old daughter, who was an eye witness to the shooting, testified, for what it might be worth, that her father did not "look drunk."

The petitioner's agitated emotional state immediately after the killing is obviously understandable quite apart from the influence of the alcohol he had consumed. Wherefore the brother-in-law's testimony that when the petitioner returned from the killing he was in a raving condition and the testimony of the brother-in-law's father that the petition-

er's eyes were a little glazed and that he acted "a little out of his head," does not necessarily show heavy intoxication.

The officers who participated in the petitioner's arrest and interrogation described his condition in various terms. The sheriff testified that when the petitioner was arrested he was alert and responsive and fully able to handle himself in his scuffle with the police officers. And he said that when he voiced disbelief in the petitioner's account of how much he had drunk, the petitioner replied that he could always hold his liquor and remain steady on his feet. The sheriff said that although the petitioner had calmed down somewhat by the time of the interrogation he was still "quite emotional." He characterized the petitioner's condition as not "intoxicated" but "just about" "under the influence."

The police captain who participated in the petitioner's arrest and interrogation ventured the opinion that on the basis of his observation he would not have arrested the petitioner for drunken driving. He described the petitioner's condition as "nervous" and "confused" but nevertheless said that the petitioner understood the questions put to him and gave responsive answers.

The doctor who at 11 o'clock took a sample of the petitioner's blood for testing said that the petitioner appeared extremely nervous, but declined to say that the petitioner was either "drunk" or "under the influence."

A brother of the woman in Portland with whom the petitioner was living, who was a police officer in a nearby city and who had first-hand knowledge of the petitioner's reaction to alcohol, visited the petitioner toward the end of his interrogation and testified that the petitioner was "under the influence" but not "drunk."

The petitioner heavily relies upon the testimony of the county medical examiner who was present during the latter part of the interrogation when the confession was being written out, who testified on cross-examination by defendant's counsel that from his observation "in the true psychiatric meaning of the term 'mania' —he did have manic tendencies."

Recalled by the State the following day this witness added by way of clarification that he had not used the word "mania" in the sense of "a variety of insanity," as defined in older medical dictionaries, but had used the word in its more modern medical sense as "a mental disorder characterized by psychomotor activity, excitement, rapid passing of ideas, exaltation and unstable attention." The doctor added: "I did not feel that he was insane at the time but I did feel that he was under [sic, in an ?] excessive emotional state with wild excitement, and certainly violent tendencies." On cross-examination, however, the doctor was clearly unwilling to say that the petitioner's state was one of "mental confusion" or that he had "lost contact" with the "reality" of the situation. All he would affirm was that he observed a "mental agitation" and a "rapid passing of ideas" on the petitioner's part.

In short, the opinion testimony bearing on the petitioner's condition runs the gamut from something less than "under the influence" to "manic tendencies." But terms such as these and the others used by the witnesses quoted herein are far from precise and at the most can convey only a general subjective impression of the petitioner's condition. While the county medical examiner defined the term "mania" with scientific precision he did not use that word to describe the petitioner's condition but only said that he showed "manic tendencies," by which the witness said he did not mean that the petitioner was mentally confused but only that he was agitated and that his ideas passed rapidly. This is definitely short of saying that the petitioner was in a state of delirium, frenzy, incoherence or uncontrollable emotion in the lay dictionary meaning of "mania" which apparently is the meaning of the word as used by the court in Mergner v. United States, 79 U.S.App.D.C. 373, 147 F.2d 572 (1945), and cases cited.

The circumstantial evidence of the petitioner's condition also covers a wide

range. There can be no doubt that he had been drinking beer throughout the afternoon followed by whiskey during the early evening. And his blood test, taken some three hours after he had ceased drinking, showed .16% of alcohol by weight or .01% more than enough to make out a *prima facie* case of drunken driving under the law of Maine. On the other hand, it appears that the petitioner was in sufficient control of his faculties to make a long distance telephone call just before the police arrived to arrest him and to handle himself competently in the scuffle that ensued. Furthermore, a letter to the woman with whom the petitioner was living in Portland was introduced by the petitioner at his trial. This letter appears to have been written by the petitioner while sitting in his car after leaving the hardware store and attests a lucid condition. The letter is of some length and apparently was intended to explain his intended suicide. Although in it he gives an account of his drinking and describes his condition as "loaded" the letter is nevertheless an entirely coherent and literate effort. And the confession itself, which the petitioner signed legibly and obviously with a steady hand, gives an intelligible, coherent, entirely rational account of his movements and activities during the eventful day.

We have discussed the evidence adduced at the petitioner's trial at length and in detail to show that the material facts bearing upon the petitioner's condition at the time of his interrogation and confession were there fully developed and that he was afforded the opportunity to introduce all the evidence he wished on that issue. The fifth circumstance listed in Townsend v. Sain, supra, under which an evidentiary hearing in *habeas corpus* is required is therefore not present in this case. Nor is the first circumstance listed in that case present here, for the merits of the factual dispute were resolved by submission to the jury under a charge wherein the court applied the correct constitutional standard of voluntariness as indicated by the excerpt from the charge quoted herein above. Wherefore

there is no occasion to remand to give the State an opportunity to retry the petitioner as in Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961), wherein the state court applied an erroneous standard. The second listed circumstance requiring an evidentiary hearing is absent, for from our recitation of the evidence it is apparent that there is ample support in the record as a whole for the state factual determination that the petitioner was not so far intoxicated that his confession was involuntary. There is no suggestion that the fact-finding procedure, trial by jury, was not adequate to afford the petitioner a full and fair hearing, nor is there any suggestion whatever of after-discovered evidence. Thus the third and fourth circumstances are absent also.

The petitioner's contention comes down to the proposition that he was not afforded a full and fair fact hearing because the state trier of fact, the jury, did not have an opportunity to hear and consider the tape recording of his interrogation by the police, which, it is said, clearly shows that the petitioner was heavily intoxicated at the time of his interrogation and confession. The argument is that under the sixth, or "open-ended," category listed in Townsend v. Sain the court below should have exercised its discretionary power to afford the petitioner an evidentiary hearing in order to consider the tape recording.

We are by no means unaware of the glaring inconsistency in relying in federal *habeas corpus* proceedings upon evidence the petitioner succeeded in excluding at his trial, where the very assertion of deprivation of constitutional right now advanced was fairly litigated as fully as the petitioner then desired. However, we shall consider the tape recording because both the Superior and the Supreme Judicial Courts of the State of Maine in the *coram nobis* proceeding considered it on the issue here presented, although it was admitted in that proceeding only for its bearing on assertions of deprivation of constitutional rights which have since been abandoned, and because the court

below decided this case on the entire record of the state proceedings.

We have read the transcript of the tape recording and at the oral argument we listened to as much of it as the petitioner's counsel wished to play back. It does not convince us of the petitioner's deep intoxication at the time he was interrogated and confessed. The most that can be said is that some of the petitioner's responses are inaudible. But it is impossible for us to say whether the petitioner's occasionally inarticulate speech is due to his intoxicated condition, or to the fact that he was not speaking into the machine, or to inadequacies in transcription due to unskillful handling of the equipment. On the other hand, the tape recording clearly shows that except for occasional instances of apparent mumbling the petitioner's answers to questions are clear, definite, rational and responsive and that he gave a lucid, coherent, logical account of his goings and comings, doings and thoughts on the eventful day. We do not consider it by any means enough to require remand to the court below with directions to exercise its discretionary power to grant an evidentiary hearing.

We have stated and considered this case in elaborate detail for two reasons: first, because it involves the application of an important federal constitutional principle to a situation which the Supreme Court of the United States has not yet had occasion to consider, and second, because we must review the entire record of the state proceedings in the light of Townsend v. Sain, which came down after the decision of the court below. Our conclusion is that the petitioner has had an eminently full and fair evidentiary hearing in the state courts, where the correct standard was applied to the resolution of the constitutional question presented. We therefore see no occasion for affording the petitioner another evidentiary hearing on *habeas corpus* in the court below.

Judgment will be entered affirming the order of the District Court.