George J. Balbaoh, J.
Defendant was indicted for a murder allegedly committed on June 17, 1972. The indictment accuses him of intentionally causing the death of a young girl, Deborah Januszko, by stabbing her with a knife.
On August 22, 1972 defendant was ordered to Kings County Hospital for a psychiatric examination. A report was received on October 10, 1972 indicating that the defendant was not an incapacitated person and did not lack the capacity to understand the proceeding against him or to assist in his own defense. Both counsel for defendant and the People accepted this finding. A hearing was waived.
*119 The defendant was arraigned on April 10, 1973 and entered a plea of not guilty. Subsequently the additional defense of not guilty by reason of insanity was interposed. A waiver of jury trial was duly filed on November 13,1973 and the defendant, pursuant to CPL 320.10, acknowledged in open court that he had signed the statement waiving a jury trial, and the court approved the waiver.
A nonjury trial was held, starting on November 26, 1974 and terminating on December 5,1974.
There are two basic issues: the issue of guilt and the issue of sanity.
I
THE ISSUE 03? GUILT
The following facts were elicited during the course of the trial. On June 17, 1972 at approximately 3:30 a.m. in the morning, the parents of Deborah Januszko were awakened by a scream. They rushed to their daughter’s room and found her sitting up on her bed, bleeding from a chest wound. She told them, “ I have been stabbed ”, and pointed to a partially opened window next to her. The police were immediately called and the girl was taken to a nearby hospital, where she died shortly thereafter.
An investigation was immediately commenced. At the outset, the police noted that a metal milkbox had been placed under the window next to the victim’s bed and surmised that the criminal had stood on this box to look inside the bedroom. On June 20, 1972 Detective Donald Palmer of the 105th Precinct noted a man walking about the area at 5:00 a.m. in the morning. The detective questioned this man, who identified himself as the defendant and gave his residence. The defendant further stated that he had no knowledge of the recent homicide on the next block. The detective then asked him what he was doing on the streets at such an early hour, and the defendant stated that he was just taking a walk. He told the detective that he was currently receiving public assistance while attending a trade school and volunteered the name and telephone number of this school. The following morning the detective contacted the trade school and, based on conversations with officials at the school, decided to question the defendant again.
Detective Palmer returned to the defendant’s residence the following evening and, finding him not at home, waited for him to return. At about 11:45 p.m.. the defendant came home and immediately stated to the officer, “ You found out about me ”, and he spoke “ about my arrest ” for the “ attempted murder *120 of the police officers ”, At this point the detective requested the defendant to accompany him to the police station for further questioning. Prior to leaving, the detective asked if he could enter defendant’s room for the purpose of viewing the backyard from the window. The defendant acquiesced, and both men went to the apartment, where the detective observed that the Januszko backyard was not visible from that window.
After the detective finished looking out the window, he turned around and saw that the defendant had just placed a pair of handcuffs on his bed. He also observed that a large knife was hung in a scabbard on defendant’s bed and further observed a box with several handles of knives sticking out of the top. The suspect was then taken to the stationhouse, and his personal property was removed. Included in this personal property were three “ girlie magazines ” found on a dresser.
At the 105th Precinct stationhouse, defendant was advised of his Miranda rights and interrogated by Detective Angelo Lamardo in a series of three interviews. The first questioning took place at approximately 12:30 a.m. on June 21, 1972. At the outset, the questioning was general and dealt with the suspect’s family and friends. Detective Lamardo then picked up one of the “ girlie magazines ” found in defendant’s room and commented unfavorably on a photograph of a nude woman with a large bust. This comment produced a bizarre reaction on the part of the defendant, who touched the picture of the nude woman in the area of her breast and said, ‘ ‘ She has lovely balls, she has lovely balls ”, After this the detective produced a knife found in the defendant’s room and placed it on the table. The defendant acknowledged, “ It’s my knife”. There was some discussion about the knife, and the detective then asked him, “ Did you hear about the girl that got hurt in Jamaica ”, and repeated the question. The defendant then put his head down, looked at the floor, and started crying. He said, “ I think I hurt a girl. I am afraid to tell you about it. You’re going to beat me up. I cut her ’ ’.
The detective then assured defendant that no one was going to harm him. The defendant was silent for a brief period of time, then got up from where he was sitting, walked over to the far side of the interrogation room, stooped down and picked up an imaginary object. This object he outlined with his hands, and it appeared to be a square box about 12 to 15 inches in size. He carried this imaginary object across the room in a bizarre pantomime and placed it on the floor before a mirror. With that, he made a motion of climbing as though he was stepping up *121 on something. Defendant then raised his hands to the mirror and started feeling the mirror with his hands. After a pause, he reached into the side of his pants and removed an imaginary object, which he held in his hands. The defendant then suddenly lunged forward and made a sound as though air were coming out of his chest. He pulled his hand back, looked at the imaginary object in it, wiped this imaginary object with his fingers and put it back into his pants. The defendant then collapsed on the floor.
The detectives picked up the defendant and placed him on a chair, where he rested for half an hour. Then a second interview was held. This time the defendant started to give brief replies to the detectives’ questions. After a few minutes he again rose from his chair and re-enacted the same imaginary scene dealing with a nonexistent box. This interview took approximately three to five minutes and, at its conclusion, defendant again collapsed to the floor.
A final period of interrogation took place approximately an hour later. This time the detectives taped the responses of the defendant to a series of questions. The tapes gave more detailed answers to the police inquiries and, among other things, gave specific information as to the physical surroundings of the deceased’s room, the colors of objects about her, and her manner of dress.
After this final interview, the police advised the defendant that they were going to take him back to the scene of the crime. At about 5:30 in the morning, the defendant was placed into a police car and was taken to the area of the crime. On the way there, the defendant inquired if Detective Lamardo was still his friend. Upon being told that he was, the defendant held the detective’s arm. When the car arrived, it stopped at the corner of 169th Street and 88th Avenue. The defendant was permitted to walk out by himself, and did so. He left the car, looked about, and came to the Januszko house. He glanced at it, walked by it to a house two alleys away, went about 20 feet back into the alleyway and removed an imaginary box from some imaginary garbage pails. He carried this imaginary object out of the alleyway back .to the Januszko house and placed it next to the rear window. He then re-enacted what purported -to be the details of the crime, including peering into the window and making a stabbing gesture. This, basically, was the People’s prima facie case of guilt.
The defendant took the stand on his own behalf and testified that he had a history of mental illness ranging back to the early *122 sixties. He indicated that he resided in Creedmoor from 1962 to 1966 and had been incarcerated in Kings County Hospital in 1971 for a period of four months. He further indicated that he had spent some time in the Mid-Hudson Institution and was ultimately returned to Creedmoor in 1972. The defendant testified under oath that he knew nothing about the Januszko homicide until he spoke to Detective Palmer on January 20. He remembered going to the police station but could not recollect ever being interviewed by Detective Lamardo or returning to the scene of the crime. He stated under oath that he did not kill the deceased. It might be noted that defendant’s testimony was clear and responsive. His answers were coherent and relevant. At one point he declined to answer questions put to him by counsel. On the whole, he gave every appearance of competency.
In cross-examination, defendant advised the court that a psychiatrist had talked to him about hypnosis, and that he had learned a technique in which he could hypnotize himself. He further admitted that he had been advised by his attorney that he had made admissions and re-enactments dealing with the death of Deborah Januszko, but that he had no memory of any such admissions.
The defendant’s attorney took the stand on behalf of his client. He stated that on July 7, 1974 he showed his client a photograph of a naked woman with a prominent bust, and that defendant changed from an active, alert person into someone who was apparently asleep. The attorney - indicated that his client appeared to go into a trance after viewing this picture. During this trancelike state, he depicted many of the incidents to which the People referred in the taped interview. He also referred to a woman’s breasts as “ balls ”.
The People basically seek to prove guilt by showing the fact of death, the physical weapons possessed by the defendant, and the complex set of circumstances leading to the crimes; all linked together by defendant’s admission of guilt and his strange re-enactment of the details of the homicide. It may be noted in this connection that an admission is not limited to words, but may also include ‘ ‘ the demeanor, conduct and acts of a person charged with a crime ”. (People v. Place, 157 N. Y. 584, 598; Richardson, Evidence [10th ed.], § 220.)
Defendant’s attorney challenges the proof of guilt by attacking the probative value of defendant’s acts and statements. Counsel contends that any form of admission was not the conscious, voluntary and intelligent statement of a knowledgeable *123 defendant, but was rather the product of a trancelike state produced by a diseased mind. Counsel further alleges that these unconscious statements were the product of either deliberate hypnotism on the part of an astute detective or a form of self-induced trance involuntarily entered into by the defendant. In either case, it is alleged that the defendant has no memory of any such acts or statements and should not be held responsible for them.
Thus, before determining defendant’s guilt, this court must consider the probative value of defendant’s statements and acts. Basically, defense counsel advances the following theory as regards those statements. He alleges that the defendant was a mentally sick man, abnormally sensitive to suggestion. Because of this mental illness, defendant developed a pattern of repressing guilt feelings. These submerged feelings could be released, on occasion, by viewing the picture of a naked woman with prominent breasts. Once these feelings were released, the defendant would enter a trancelike state and make admissions of which he would later have no recollection. In proof of this theory, defendant points out that the police officers themselves agree that at certain times the defendant had a vacant stare and made strange noises during interrogation, such as moans, groans and whimpers. The record further indicates that after the first interview and the second interview, the defendant collapsed as though mentally exhausted. Finally, it might be noted that both psychiatrists who testified in this action concede that defendant did have a high trance susceptibility and, under certain circumstances, might go into a trancelike state spontaneously.
In analyzing this argument, this court finds that the facts do not support a belief that Detective Lamardo, either by accident or design, sought to hypnotize the defendant. Hypnotism was defined in Austin v. Barker (96 N. Y. S. 814, 818), as “ a condition, artificially produced, in which a person hypnotized, apparently asleep, acts in obedience to the will of the operator ”. If this definition be accurate, and it would appear to embody the common views regarding this state, then it is clear that its use in obtaining statements should be viewed with suspicion, since the fact remains that these statements may well constitute the opinion of the one performing the hypnotic act and not the defendant. Further, since hypnotism is a medical technique requiring training and professional skill, logic would indicate that a foundation should be laid prior to its admissibility. At such time, the qualifications of the examiner could be *124 explored, as in polygraph and other technical tests. In the case at bar there has been no testimony indicating that hypnosis was intended or employed and no suggestion that the detective had the expertise, background, or training to induce this state in the defendant. Hence the court rejects the view that the defendant was hypnotized.
This, then, leads to the second hypothesis, namely, that the defendant in some unexplained fashion put himself into a trance or entered a trancelike state. While there appear to be no specific cases on “ self-induced trances ”, the general rule pertaining to self-induced intoxication, either by drugs or alcohol, might appear to be relevant on this issue. This rule holds that ‘1 ‘ proof that the accused was intoxicated at the time he confessed his guilt of crime will not, without more, bar the reception of the confession in evidence. But if it is shown that the accused was intoxicated to the degree of mania, or of being unable to understand the meaning of his statements, then the confession is inadmissible.’” (People v. Schompert, 19 N Y 2d 300, 305.)
Another factor which the court in that case (People v. Schompert, supra) decided would assist in determining the value of statements made in a semicomatose state was the accuracy or the trustworthiness of those statements. As was said (p. 307): “If trustworthiness is the criterion, then it is logical that the trustworthiness be testable by the content of the qonfession or evidence of subsequent events which confirm the reliability of the confession (see State v. Alexander, 215 La. 245, 249; State v. Bozarth, 361 S. W. 2d 819, 828 [Mo.]; State v. Wise, 19 N. J. 59, 91-92, supra; cf. Doyon v. Robbins, 322 F. 2d 486, 494 [1st Cir.], cert. den. 376 U. S. 923, supra; McAffee v. United States, 111 F. 2d 199, 203 [D. C. Cir.], cert. den. 310 U. S. 643, supra.) ”
In People v. Adams (26 N Y 2d 129), a case in which a defendant claimed that she was under the influence of drugs (sleeping pills) and made a motion to bar the use of her confession on the grounds that it was involuntary, the court stated (p. 137): “With respect to defendant’s argument that her alleged drug intoxication made the statements involuntary, we have held that self-induced intoxication does not ipso facto render a confession invalid (People v. Schompert, 19 N Y 2d 300). It is only when the defendant’s will has been overbourne by interrogation (Townsend v. Sain, 373 U. S. 293, 307) or the state of intoxication has risen to the degree of mania, or the statements are shown by reference to other evidence to be unreliable, *125 that a confession is rendered inadmissible (People v. Schompert, supra, at p. 305). The same criteria are applicable to admissions made by a defendant suffering from a mental disease. (Blackburn v. Alabama, 361 U. S. 199; People v. Howard, 27 A D 2d 796.)”
So, even assuming that the defendant at some stage did enter a trancelike state, such admissions would have probative value if their subsequent accuracy could be confirmed.
In light of this reasoning, the court now turns to the confessions themselves. As regards the first interview in which the defendant acknowledged cutting a girl and making gestures relating to an imaginary box, this court finds these statements to be voluntary and, consequently, to possess high probative value. The facts seem to indicate that the defendant was aware of what he was saying and does not appear to have entered a trance at this point.
As for the second interview, in which the defendant gave brief answers, and the third interview, in which the defendant gave taped answers, this court finds that the defendant was apparently in some form of trance for at least a portion of this time and concludes that the probative value of these statements and acts is minimal.
The final interview, dealing with the visit to the site of the crime, appears to have considerable probative value. On this visit, the defendant appears to have been aware of what was transpiring. He spoke to the detective and even held on to his hand. Further, when the squad car reached the area, the defendant got out all alone and went to the victim’s home and re-enacted scenes which indicate a guilty knowledge.. The facts indicate that the defendant was, for some period, in a state of trance during the later enactment, but it would appear that he enacted his acts through his own knowledge and was not susceptible to outside influences. Hence, under the trustworthiness test laid down in People v. Schompert (supra) these admissions by acts would be reliable. Based upon the above reasons, this court concludes that the statements and actions of the defendant are admissible and have the probative value indicated.
n
THE ISSUE OF DEFENDANT’S SANITY
Dr. Harry LaBurt, a licensed psychiatrist, was called by the defendant. He testified that he had examined this defendant and reviewed his records of treatment, including his early stay at Creedmoor, his incarceration at Kings County, his recent *126 treatment in the Mid-Hudson Institution, and his final period at Creedmoor. It was Dr. LaBurt’s opinion that the defendant suffered from a hysterical personality of the disassociative type. The doctor characterized this mental disease as a condition in which an individual who has problems represses them into the unconsciousness of his mind. This repression, in turn, creates anxiety, which seeks some form of expression. Under extreme pressure, such a person experiences a personality change and becomes somebody else. Sometimes in such a state, this individual may indulge in conduct which will be foreign to his normal nature. In rare cases, the personality changes might produce a dualism which society finds unacceptable, “ a Dr. Jekyll and Mr. Hyde ” personality.
Dr. LaBurt further testified that it was his belief that once a person entered into this antisocial stage he would have no recollection of what transpired in this altered state. In defendant’s case, the psychiatrist could not state with certainty the factors which might specifically trigger off such a personality change, but he felt that, since the defendant obviously suffered from sexual problems, his concentration on the female breast might induce this bizarre response.
Based on this examination and a review of defendant’s past history, Dr. LaBurt concluded that at the time of the crime defendant was in a withdrawn state of mind and, in this ‘ ‘ dis-associative state ”, would have been suffering from a mental disease or defect and would not have had the substantial capacity to understand and know the nature and ^ quality of his act.
Under cross-examination, Dr. LaBurt further indicáted that a person in such a ‘ ‘ withdrawn state ” “ probably could not appreciate the difference between right and wrong”, since an act criminal in itself would have a different meaning to'the second personality.
The People, in turn, sought to rebut this testimony by calling Dr. Daniel Schwartz, a licensed psychiatrist. Dr. Schwartz testified that he examined defendant on eight separate occasions, from June to October, 1972, and examined his past medical record. It was his belief that the defendant was clearly suffering from a mental illness but did not suffer from the personality disorder associated with classic hysterical neurosis. This form of illness occurs when a person, subjected to great emotional stress, retreats from unpleasant reality into a totally different personality. It was Dr. Schwartz’s view that, while defendant definitely had tendencies to ‘ ‘ kind of retreat ’ ’ into another personality under times of great stress, this retreat was vol *127 untary as opposed to the involuntary retreat of a “ Dr. Jekyll and Mr. Hyde ” hysterical neurosis. In essence, it was the doctor’s belief that defendant’s symptoms did not warrant a diagnosis that he was possessed ¡of a dual personality. The doctor further testified that such cases were quite unusual and that he has only dealt with one in his professional career.
In support of his view that defendant’s condition was not a true hysterical neurosis, the doctor pointed out that the defendant apparently had the ability to regress back and forth at will from a normal to abnormal state, and such a condition is not characteristic of a true dual personality; that the defendant did possess a high degree of susceptibility and apparently could go into a trancelike state easily, but this was voluntary rather than involuntary and defendant was conscious of his act. In this trancelike state the psychiatrist felt that the defendant was never truly reliving past events but simply remembering them.
It was Dr. .Schwartz’s diagnosis that, while the defendant has a tendency toward hysterical neurosis, there was no evidence to indicate that this was part of his normal everyday makeup. Dr. Schwartz stated that the defendant was mentally ill and suffered from an unspecified personality disorder, but that this illness was not so pronounced as to absolve him from legal responsibility. In his opinion, defendant was criminally responsible for the present acts in that they were not the result of mental disease or defects and that he did possess such substantial capacity to know and appreciate the nature and quality of his acts.
In considering the issue of defendant’s sanity, it is well recognized that psychiatry is, at best, an inexact science and that psychiatrists may differ among themselves as to diagnosis and evaluation. Both doctors clearly agree that defendant is mentally sick and suffering from repressed sexual problems. Both further agree that his personality is characterized by a high degree of trance-susceptibility. However, they differ on the nature and consequence of this sickness. Dr. LaBurt characterizes this sickness as a unique classical dual personality, a true case of Dr. Jekyll and Mr. Hyde. Dr. Schwartz, on the other hand, maintains that this is not a true case of a dual personality but rather a mental illness in which the defendant has a tendency to retreat into a trancelike state for his own benefit. He further indicates that, while defendant’s symptoms may be unique, they do not constitute lawful incompetence.
*128 In considering the expert testimony presented on the issue of sanity, this court finds that, basically, both doctors have presented and emphasized a series of symptoms which characterize defendant’s behavior. He is clearly a man mentally ill and has suffered from a past history of mental illness, one early diagnosis being that he suffered from schizophrenia. His illness appears to be characterized by a strange, almost self-serving, ability to enter a trancelike state under pressure. Additional symptoms appear to be an inability to remember specific acts. There was testimony that the defendant appeared to have a fixation on the female breast which he designated as ‘1 balls ’ ’, and that this fixation induced a trancelike state. There were suggestions of a tendency to commit antisocial acts in this trancelike state. However, the fact remains that mere symptoms of disease do not constitute mental illness as defined by section 30.05 of the Penal Law. Thus, a past history of mental illness is not, per se, proof of a current mental disease (People v. Boundy, 10 N Y 2d 518); nor is an inability to remember specific acts, even if this does constitute true amnesia. (People v. Francabandera, 33 N Y 2d 429.) Similarly, an irresistible impulse to commit specific acts is not considered insanity in this State. (People v. Wood, 12 N Y 2d 69.) Even if the sum total of these symptoms indicated an inability on defendant’s part to conform his conduct to the requirements of the law, this still would not relieve him of criminal liability. (See Richard G. Denzer & Peter McQuillan, Practice Commentaries, McKinney’s Cons. Laws of H. Y., Book 39, Penal Law, § 30.05, p. 48.) The law is clear that a person is freed from culpability only if his mental sickness is of such a nature as to fall within the rigid framework of the Penal Law.
Based upon the above, this court finds, after weighing and evaluating the testimony of the two psychiatrists who have rendered conflicting opinions, that Dr. Schwartz’s testimony is the more persuasive, convincing and believable and concludes that the defendant in this action does not suffer from a mental disease or defect as would relieve him from criminal liability under section 30.05 of the Penal Law.
VERDICT
This court finds that the People have sustained their burden by proof beyond a reasonable doubt that at the time of the occurrence, namely, June 17,1972, the defendant was not suffering from a mental disease or defect which would excuse criminal conduct and, therefore, had substantial capacity to know and *129 appreciate the nature and consequence of his conduct and that his conduct was wrong; and that on such date the defendant, with intent to cause the death of Deborah Januszko, did cause the death of said person by stabbing her with a. knife and is guilty of the crime of murder, as charged.