THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOSEPH BALDI, Appellant.

Second Department, November 7, 1983

APPEARANCES OF COUNSEL

*William E. Hellerstein* (*Lynn W. L. Fahey* of counsel), for appellant.

*John J. Santucci, District Attorney* (*Deborah Carlin Stevens* of counsel), for respondent.

OPINION OF THE COURT

*Per Curiam.*

In determining whether a custodial suspect's right to counsel has attached, the police are entitled to rely on the suspect's statements which reasonably lead them to believe that there has been a disposition of the unrelated charges against him. On the instant record, we conclude that the defendant's right to counsel had not attached when he waived his rights to remain silent and to the

assistance of counsel. Therefore, the statements he made need not be suppressed.

The case has a lengthy history and is currently before us following remittitur from the Court of Appeals and our own remittitur to Criminal Term to hear and report on the right to counsel issue. Criminal Term has conducted a hearing and submitted its report. The facts we recite in the paragraphs that follow derive from Criminal Term's remittitur hearing and from the *Huntley* hearing which took place prior to defendant's trial for murder.

On September 5, 1971, defendant was arrested for the attempted murder of a police officer, burglary and possession of a weapon. Legal Aid representation was provided and after indictment defendant was adjudicated incompetent to stand trial, sent first to one mental institution, then to another, and subsequently released from the second, Creedmoor State Hospital, in February, 1972 without notice to the Queens District Attorney. On June 20, 1972, at about 5:00 A.M., Detectives Donald Palmer and Michael Walsh were canvassing the area of the murder of Deborah Januszko, which occurred three days earlier, when they noticed the defendant who then identified himself and stated that he was attending a trade school. Before leaving their tour of duty at about 7:00 A.M., the detectives checked with the Bureau of Criminal Investigation (BCI) and were informed that the defendant had no criminal record. They filed a report, leaving the name and address of the school with the day-shift detectives to ascertain whether defendant had attended the school. Detective Conrad Mazza, supervisor of the Januszko murder investigation, read the report prepared by Palmer and Walsh and attempted to obtain further information concerning the defendant. At the remittitur hearing he testified that he could not recall if he telephoned Creedmoor or BCI but he learned that defendant had a prior record which included arrests for felonious assault, forgery and possession of a weapon. He was unaware of the dates of these arrests or whether they were still pending and was unable to ascertain any disposition. Mazza wrote a note for the night-shift detectives to "follow-up" on the defendant.

When Palmer and Walsh returned to work on the evening of June 20 they received a message that defendant was not attending school regularly. At about midnight when they spoke to defendant outside his apartment he declared: "You found out, huh". When Palmer asked him, "Found out what?", defendant replied "About my attempted murder on a cop" and that "I was sentenced to Creedmoor". At the hearing, Detective Palmer apparently had difficulty in remembering whether defendant used the phrase "sentenced to" or "taken" to Creedmoor but Walsh's testimony that the term "sentenced to" was employed was unequivocal and Criminal Term found that defendant had stated he was sentenced. Without inquiring into the matter, the detectives asked defendant to accompany them to the precinct and he agreed. At the precinct they turned the defendant over to Detective Angelo Lombardo for questioning. Lombardo tried to contact Creedmoor State Hospital but was told that the record room would not open until the following morning.

Lombardo, along with Mazza, gave the defendant *Miranda* warnings and questioned him intermittently from about 1:00 A.M. to 6:00 A.M. During this period defendant confessed to the Januszko murder and re-enacted the incident several times with the last re-enactment taking place at the scene of the crime. During the interview, the defendant mentioned that he was an "out-patient from Creedmoor" because he had assaulted a policeman. Defendant was formally arrested between 8:00 and 9:00 on the morning of June 21. A detective arriving at the precinct after the arrest spoke with a clerk at Creedmoor State Hospital and learned that the attempted murder charges were still pending.

In October, 1974, defendant was tried by jury on the indictment arising out of the September, 1971 incident involving the police officer and was convicted of attempted murder, burglary in the second degree and felonious possession of weapons. The following month a *Huntley* hearing was held and the court ruled that the June 21 confession was voluntarily made and thus admissible. Despite defendant's insanity defense, he was convicted of the Januszko murder after a Bench trial (*People v Baldi*, 80 Misc 2d 118).

On his appeal to this court, we rejected the contention that his sanity had not been proven beyond a reasonable doubt but reversed the judgment of conviction on the ground that defendant was denied the effective assistance of counsel (*People v Baldi,* 76 AD2d 259). Concluding that defendant had not been denied that right, the Court of Appeals reversed our order and remitted the case to this court to consider whether defendant's waiver of his right to counsel on June 21, 1972 was effective in light of the recent decision in *People v Bartolomeo* (53 NY2d 225) (*People v Baldi,* 54 NY2d 137, 152). Upon remittitur we affirmed the November 25, 1974 conviction for attempted murder, burglary in the second degree and possession of weapons but as to the January 16, 1975 conviction for the Januszko murder we held the appeal in abeyance and remitted the case to Criminal Term to hear and report on the factual issues relating to whether *Bartolomeo* (*supra*) applied (*People v Baldi,* 87 AD2d 843). As we have previously noted, Criminal Term (ROTKER, J.) has complied.

In *People v Bartolomeo* (*supra*), the Court of Appeals held that an officer's knowledge of an outstanding unrelated criminal charge against a suspect precludes custodial interrogation of the individual in the absence of an attorney if in fact he was represented by an attorney on that charge. The interrogating officers in *Bartolomeo* were aware of the suspect's arrest for arson only seven days earlier by members of the same police department and were under an obligation to inquire as to whether the suspect was represented by counsel on the unrelated charge. Failing to make such inquiry, the police were chargeable with what an inquiry would have disclosed and were foreclosed from questioning defendant unless the attorney was then present (*People v Bartolomeo, supra,* pp 231-232).

At the outset, we reject the People's claim that *Bartolomeo* (*supra*) is inapplicable here because the defendant was not in custody during the questioning at issue. Custodial interrogation, a factual question (*People v Waymer,* 53 NY2d 1053), is defined as questioning initiated by law enforcement officers as would lead a reasonable man to believe that he had been deprived of his freedom in a significant way (*Matter of Kwok T.,* 43 NY2d 213, 219;

*People v Rodney P.,* 21 NY2d 1, 9). Here the urgency of the officers' request that the defendant accompany them to the precinct may have been considered as a command for co-operation (see *People v Byers,* 71 AD2d 77). Furthermore, the questioning was accusatory in nature (see *People v Yukl,* 25 NY2d 585, cert den 400 US 851) and took place at the precinct in a police-dominated atmosphere (see *People v Huffman,* 41 NY2d 29) over an extended period with no indication that defendant would have been permitted to leave (see *People v Johnson,* 91 AD2d 327).

We turn then to the applicability of the *Bartolomeo* rule and to defendant's contention that since the police were aware of his prior arrests they were obligated to inquire as to whether he was represented by counsel on the prior charges. As revealed at the original *Huntley* hearing, the detectives were told by the defendant that he had been arrested for the attempted murder of a police officer and that he had been sentenced to Creedmoor State Hospital. At the remittitur hearing the additional evidence revealed that (1) the police did not learn of the pendency of defendant's prior charges until after defendant was formally arrested on June 21, 1972; (2) Detective Mazza learned on June 20, 1972 that defendant had an arrest record that included arrests for assault, forgery and possession of a weapon; (3) Mazza was unable to obtain the dispositions of these past arrests and was unaware of when they had occurred; and (4) during the interrogation defendant told Mazza that he was an out-patient at Creedmoor because he had assaulted a police officer.

Although we affirm Criminal Term's finding that the police did not learn that the charges were still pending until after the defendant confessed, we must still determine whether the officers' actual knowledge prior to the confession resulted in an imputation of further knowledge that the charges were still pending. While the age, proximity in location and seriousness of the crime are factors in determining whether the police should have known that the charges were still pending (see *People v Kazmarick,* 52 NY2d 322), only the seriousness of the crime was known to the officers in this case. When a suspect who has an arrest record declares that he has already been sentenced for a

crime, we do not believe it reasonable to impute constructive knowledge to the police that charges are still pending against him. The Court of Appeals has held that information that a suspect has a record does not lead to an inference that the charges against him are of recent origin (cf. *People v Smith,* 54 NY2d 954). A contrary conclusion would impose upon the police the duty to inquire of every suspect whether any prior charges are still pending against him and at this point in the development of the law that is an obligation that neither *Bartolomeo* nor its progeny have mandated. Awareness of a recent arrest for a serious crime places the police on notice that the charges are not likely to have reached disposition (see *People v Smith, supra; People v Bartolomeo, supra; People v Patterson,* 85 AD2d 698) but without knowledge of the temporal proximity of the arrest the inference of nondisposition cannot be drawn.

Since the defendant's statement to the officers informed them that he had been "sentenced" to Creedmoor there was a reasonable basis for them to conclude that the charges of which they were aware were no longer pending (see *People v Fuschino,* 59 NY2d 91). The word "sentenced" obviously refers to the imposition of punishment at the completion of criminal proceedings and in defendant's case it was consistent with a commitment following a successful insanity defense. Although we now know that Baldi was actually confined to two mental institutions after being found unfit to aid in his own defense (CPL 730.20) he may not escape the consequences of the reasonable inferences to be drawn from his own statement. His failure to make any reference to the arrest on the forged instrument charge is insignificant since the charge was not actually pending when the police interrogated him (see *People v Kazmarick,* 52 NY2d 322, *supra*). In sum, we cannot say the police acted unreasonably when they questioned defendant before obtaining his complete criminal history. The officers' primary task was to investigate the Januszko murder and not to launch an extensive inquiry into the status of defendant's prior charges (see *People v Servidio,* 77 AD2d 191, 197, affd 54 NY2d 951) after the information defendant personally provided indicated a disposition of the criminal charges against him.

This is not a case where it can be said that the police deliberately overlooked the obvious or insulated themselves from actual knowledge of the pending charges (see *People v Servidio,* 54 NY2d 951, *supra*). In 1972 when the described events occurred, a defendant could be interrogated about matters unrelated to those for which he already had counsel (see *People v Taylor,* 27 NY2d 327) and it is not surprising that Detectives Palmer and Walsh did not inquire further about the unrelated charge brought to their attention. They did, however, make extensive efforts to check out defendant's criminal record but were not completely successful until after defendant's interrogation. That Detective Mazza could not obtain the dispositions is not particularly relevant since the BCI system, as he testified, was troubled by inaccurate and incomplete information, especially considering the relatively low level of its sophistication in 1972 (see *People v Jennings,* 54 NY2d 518; First Ann Report of Div of Crim Justice Servs, 1973, pp 25-42; Doernberg v Zeigler, Due Process Versus Data Processing: An Analysis of Computerized Criminal History Information Systems, 55 NYU L Rev 1110, 1153). Since we decline to impute constructive knowledge to the officers on the facts in this record, the right to counsel had not attached when defendant made his statements and presence of counsel was not a condition to his waiver of the right to remain silent and to have assistance of counsel.

Defendant also argues that the June 21, 1972 confession must be suppressed as resulting from custodial interrogation without probable cause. *Dunaway v New York* (442 US 200), which held that police detention of an individual for custodial interrogation must be supported by probable cause, was held retroactively applicable to cases pending on direct appeal (*People v Coleman,* 56 NY2d 669) provided the issue was raised in some manner at nisi prius (*People v Cappiello,* 85 AD2d 608). But since the Fourth Amendment issue was not raised at the suppression hearing any argument with respect to *Dunaway* was not preserved for our consideration and is deemed waived (see *People v Cappiello, supra; People v Jones,* 81 AD2d 22; see, also, *People v Tutt,* 38 NY2d 1011).

Defendant's final contention that his June 21, 1972 statements were involuntarily given was resolved on the

prior appeal (*People v Baldi,* 80 Misc 2d 118, 122-125, revd on other grounds 76 AD2d 259, 275, *supra*). Suffice it to say that there was adequate support in the record for Criminal Term's finding that the defendant's statements and actions were shown to have been trustworthy despite indications of mental disease (see *People v Schompert,* 19 NY2d 300) and the People have sustained the burden of proving beyond a reasonable doubt that the statements were the product of a meaningful act of volition (see *Blackburn v Alabama,* 361 US 199).

Accordingly, the judgment of the Supreme Court, Queens County, rendered January 16, 1975, should be affirmed.

MOLLEN, P. J., DAMIANI, TITONE and LAZER, JJ., concur.

Judgment of the Supreme Court, Queens County, rendered January 16, 1975, affirmed.