OPINION OF THE COURT
Herbert I. Altman, J.
The defendant is charged with murder in the second degree (two counts) and robbery in the first degree arising out of the shooting of Michael Murphy in Central Park on January 21, 1979.
Although defendant was not formally arrested on the instant charges until October 8, 1980, he was in fact arrested, along with two others, for unrelated robberies during the early morning hours of January 22,1979. Those robberies were committed in Bronx County approximately an hour and a half after the Central Park shooting and shortly before the arrest.
I. THE ISSUE
Defendant seeks to suppress the receipt into evidence of statements made by him during certain telephone calls he made to a detective assigned to the Michael Murphy homicide and a former Assistant District Attorney (ADA) and also seeks to suppress a letter mailed by him from Rikers Island to that former ADA. He contends that the introduction of those statements would result in a deprivation of his State and Federally guaranteed right to counsel.
For the purpose of the hearing, defendant concedes that he was the anonymous caller and letter writer, although he did not divulge his identity in those calls or letters. No issue has been raised at the hearing concerning the need for Miranda warnings or actual voluntariness.
*883 II. THE FACTS
On October 17, 1979, approximately nine months after the shooting of Michael Murphy, two telephone calls from an anonymous caller were received by the switchboard operator at the Central Park Precinct concerning the Murphy homicide. Thereafter, commencing on March 12,1980, a series of 18 more anonymous calls were received, four by Detective James O’Neill at the Central Park Precinct and 14 by former ADA Steven Shapiro.
The Murphy homicide was unsolved at the time the calls commenced. It was known, however, that the murder weapon had been a .25 caliber revolver. As a result of the information obtained during the course of the conversations, the investigation progressed rapidly and ultimately culminated in the discovery of the identity of three suspects. Ms. Gardenia Elliot, a telephone switchboard operator on duty on October 17, 1979, received the first two telephone calls.[1] The caller did not reveal his identity or any information about himself during the course of these calls. He stated in the course of the first call that he would provide the police with the names of the participants in the January, 1979 shooting of a Caucasian in Central Park if he was provided with the caliber of the murder weapon. The operator obtained the requested information and, during the second call, relayed it to the caller. In return the caller stated that the participants’ names were Earl, Chris and George.
During the course of the next eight calls Detective James O’Neill, assigned to the Central Park Precinct, spoke with the caller on four occasions (March 12 and March 15, and twice on March 17,1980) and ADA Shapiro spoke with him four times (twice on March 27 and again on March 31 and April 12, 1980). During the March 15 conversation the caller revealed to Detective O’Neill that his purpose in calling was to enter into a “deal” with the District Attorney’s office. He indicated that he had information pertaining to the Murphy homicide, as well as other criminal matters, and that he hoped to exchange such information for “lower bail”. The caller was asked, during that conver *884 sation, general questions about the crime in order to ascertain his actual familiarity with the incident. Nothing said during those conversations led the police to believe that they were speaking to a person who bore any criminal responsibility for Mr. Murphy’s murder.
During the March 15 conversation the caller revealed that he was a sentenced prisoner on Rikers Island awaiting transfer to an up-State facility sometime within the next two weeks. Thereafter, during the conversation of March 17, he mentioned the existence of other cases against him, although he was somewhat vague about the nature of those other cases. However, during a later conversation with ADA Shapiro (first call on March 27) the caller indicated that a homicide charge was pending against him in Bronx County.
During the first conversation of March 17, 1980 Detective O’Neill told the caller, after having been advised to do so by ADA Shapiro, that it might be possible to arrange a deal, but that the caller would first have to reveal his identity and the nature of his information. While the caller seemed eager to enter into a deal, he expressed reluctance to reveal his identity. Detective O’Neill therefore suggested that the caller contact an attorney and proceed anonymously through that attorney. Although the caller agreed, during the next conversation he indicated that an attorney was no longer assigned to his case. Detective O’Neill then suggested that he contact the Legal Aid Society on Rikers Island for assistance. It should be noted that during a subsequent conversation with ADA Shapiro (first conversation of March 27) the caller seemed to suggest that he was represented by counsel. He ultimately disclosed the names of two individuals who, he indicated, represented him in a pending homicide matter in The Bronx.[2]
During the course of these conversations with the caller, ADA Shapiro repeatedly emphasized his position regarding a “deal” with the caller, namely, that none would be entered into until he knew the nature of the caller’s infor *885 mation, as well as information concerning the caller’s identity and his cases.
On one occasion (afternoon conversation of March 27), ADA Shapiro told the caller that he needed “some information” regarding the crime in order to proceed with a “deal”. When the caller was asked the last names of the individuals involved in the Murphy homicide, he refused to respond, stating that if he did so, his co-operation would be apparent to the perpetrators of the homicide, as they knew who he was.
The impasse then existing, i.e., the ADA’s refusal to enter into a deal on the basis of insufficient information and the caller’s refusal to reveal his identity until he was assured that a deal would be made, continued without resolution throughout all of the periods in question.
Thereafter, during the conversation of March 31, 1980, the caller stated that he had written a letter to ADA Shapiro and that it was “all in the letter”. I find that the sending of that letter was not the result of any police or prosecution suggestion. The letter was not received until April 3 or 4. In the letter the writer admitted his participation with two others in the Murphy homicide. The writer of the letter referred to himself as George, the code name which the anonymous caller had agreed to use during his telephone conversations with Detective O’Neill and ADA Shapiro.
Until the point in time that ADA Shapiro received the letter, those persons who had spoken to the caller on the telephone were of the belief that he was merely a witness to the Murphy homicide. However, after the receipt of the inculpatory letter, ADA Shapiro came to the obvious conclusion that the anonymous caller was in fact a suspect in that homicide.
During the course of the next three conversations, one on April 4 and two on either April 14 or 15, 1980 (hereafter April 14/15) ADA Shapiro neither questioned the caller concerning the contents of the letter nor sought any details relating to the Murphy homicide. As it was clear that the caller intended to remain anonymous, ADA Shapiro sought to ascertain his identity through indirect means. *886 This included the questioning of defendant with regard to his Bronx cases. Although no questions were asked about the underlying facts of those cases, information was sought about appearance dates in the hope that the answers would provide information which could be used to learn the caller’s identity. ADA Shapiro also urged the caller to write another letter in the hope that he would reveal further clues (possibly including fingerprints), which would lead to the discovery of his identity. In fact, during a conversation on April 14/15, the caller revealed that he had received a term of 4 to 8 years in the case in which he had been sentenced.
Sometime between the conversation of April 14/15 and the one on April 17 ADA Shapiro was able, by virtue of information obtained from the caller, to learn his identity. Armed with the knowledge that the shooter in the Murphy homicide had been sentenced to probation in The Bronx on April 2, 1980,[3] ADA Shapiro sought a list of all those defendants who had been so sentenced on that date. In the list he found a defendant whose first name was Earl, one of the names mentioned by the caller during the October calls. The ADA assigned to Earl’s case was contacted. He advised ADA Shapiro that: (1) Earl McFarlin had been sentenced to probation on two Bronx armed robbery charges; (2) Mr. McFarlin’s codefendants in that case were Floyd Cowart and Harold Verley; (3) Mr. Cowart had been sentenced to a term of 4 to 8 years; (4) a .25 caliber revolver had been.seized from an automobile pursuant to the arrest of the three defendants; and (5) Mr. Cowart did in fact have a homicide case pending in Bronx County. Based upon that information, ADA Shapiro reasonably concluded that the anonymous caller was Mr. Cowart.
ADA Shapiro thereafter spoke with the caller on seven more occasions (April 17, four times on April 21, April 26 and May 22, 1980). During the course of those calls he did not reveal his belief that he knew the caller’s identity. Instead he continued to encourage the caller to reveal his identity in order that they could proceed with a “deal”, *887 even though as of about April 21 he no longer had any desire to enter into one.[4]
On April 26, 1980 two detectives spoke with Mr. Verley and received a statement from him which conformed in substance to the statement contained in the letter sent by the caller. ADA Shapiro took a similar statement from Mr. Verley two or three days thereafter.
I find that throughout the period in question defendant was in fact represented by counsel in unrelated pending cases. I further find that defendant, by refusing to disclose his identity, had made it impossible for the prosecutor to learn the name of his attorney. I also find that information imparted in the first series of telephone calls to Detective O’Neill revealed that the anonymous caller probably had one or more pending cases.
I note that James Vinci, Esq., of the Legal Aid Society, testified that had the society’s telephone number been given to defendant, an attorney would have been supplied to him to act as an intermediary, had the defendant requested such assistance. Such testimony is of little value as defendant at all relevant times had the ability to have an attorney contact ADA Shapiro, as he was importuned to do. His failure to contact an attorney resulted solely from his desire to maintain anonymity. The defendant clearly was unwilling to reveal his identity or to have another represent him in the absence of an assurance that an agreement could be reached.
III. CONCLUSIONS OF LAW
. Once the right to counsel attaches, a defendant may not waive that right in the absence of counsel; consequently, any statements made in the absence of counsel without a proper waiver must be suppressed (People v Skinner, 52 NY2d 24, 28; People v Settles, 46 NY2d 154, 165-166). Two lines of cases have evolved which establish guidelines for determining when the right to counsel attaches. Under one line the right attaches with the commencement of a formal *888 adversary proceeding without regard to whether a defendant has requested counsel. (See, e.g. People v Samuels, 49 NY2d 218; People v Settles, supra; People v Meyer, 11 NY2d 162.) This line of cases is inapplicable here as no formal proceeding had been commenced against defendant with regard to the Michael Murphy homicide during the course of the telephone conversations.
Under the second line of cases, there is no requirement that a formal adversary proceeding be commenced in order to trigger the right to counsel. Rather, as the court noted in People v Kazmarick (52 NY2d 322, 327), there exists a “distinct line of cases beginning with People v Donovan (13 NY2d 148) and running through People v Arthur (22 NY2d 325) and People v Hobson (39 NY2d 479), which articulates the rule that a suspect who has retained or been assigned counsel may not be questioned about the specific charge on which he is being held in the absence of counsel.”
The court further noted (52 NY2d, at p 327) that this rule has been expanded to other factual situations. It observed that in People v Rogers (48 NY2d 167) the rule was held “to bar questioning of a suspect who is in custody and represented by an attorney, about matters unrelated to the charge on which he is being held, in People v Cunningham [49 NY2d 203], to a suspect in custody not yet represented by counsel but who has requested counsel, and in People v Skinner (52 NY2d 24) to one not in custody but who is questioned about a matter under investigation in relation to which he is known by the officials to have obtained counsel.” While the Court of Appeals has not yet held that the mere fact that the police are aware that an individual in custody has an unrelated criminal matter pending against him is sufficient to trigger that individual’s right to counsel (People v Kazmarick, supra), it has held that if the police are aware of the unrelated criminal matter pending, they are charged with knowledge of the information they would have acquired from an investigation as to whether the person was in fact represented by counsel (People v Smith, 54 NY2d 954; People v Servidio, 54 NY2d 951; People v Bartolomeo, 53 NY2d 225). Thus, in Bartolomeo, the court held {supra, p 232) that the police “were foreclosed either from questioning defendant or from *889 accepting his waiver of counsel’s assistance unless his attorney was then present”, as police inquiry into the defendant’s outstanding charge, of which they were aware, would have revealed that he was, in fact, represented in that matter.
The application of the law to the facts in this case, is more readily understandable if the calls are divided into four discrete periods. These periods reflect the dynamic changes which occurred in the legal relationship between the caller and the recipients of the calls due to the change in the information available to these recipients.
The first period consists of the two calls made to the telephone switchboard operator at the Central Park Precinct in October, 1979.1 find, and defense counsel concedes, that defendant’s right to counsel had not as yet attached. The calls were made by an anonymous caller who merely claimed to have some information regarding the Murphy homicide. Accordingly defendant’s statements made during these calls are admissible.
The second period consists of the next eight calls, half of which were made to Detective O’Neill and the balance to ADA Shapiro, all of which occurred between March 12, 1980 and April 2, 1980.
I find that during that period the police knew or should have known, despite the somewhat contradictory and vague nature of the caller’s statements, that there was a likelihood that at least one unrelated matter was pending against him and that he was represented by counsel in that matter. However, this fact alone, under existing case law, was insufficient to trigger the caller’s right to counsel.
Unlike the defendant in People v Rogers (supra), who was also known by the police to be represented by counsel in an unrelated matter, the defendant here was neither in custody nor subjected to interrogation during this period. In Rogers the defendant was arrested, advised of his Miranda rights and thereafter taken into custody and again advised of his Miranda rights. Before being questioned for a two-hour period, the defendant informed the police that he was willing to talk to them despite the fact that he had an attorney. After two hours of questioning, during which *890 the defendant denied his involvement in the crime, the police were advised by the defendant’s attorney to cease further questioning. However, under a purported waiver of defendant’s rights, and while manacled, defendant was further questioned for approximately four hours on an unrelated matter. After that period of interrogation the defendant uttered an inculpatory statement, which was ultimately suppressed on the ground that it was obtained in violation of his right to counsel.
Here the police and an ADA were confronted with an anonymous caller, who they believed in good faith during the period in question, was a mere witness to a crime. While they were aware that the caller was incarcerated on Rikers Island, it is clear that since they were ignorant of his identity, the caller was not within their custody. He was free to initiate and to terminate the calls at his own whim and, in fact, did so.
Nor could the questions asked by Detective O’Neill and ADA Shapiro be deemed to constitute “interrogation” regarding the Murphy homicide. Their questions were not “reasonably likely to evoke an incriminating response” from the caller (see Rhode Island v Innis, 446 US 291, 301). Rather, the questions and statements made by Detective O’Neill and ADA Shapiro were aimed at facilitating the caller’s stated purpose in contacting the police in the first instance, namely, to exchange his purported information concerning the Murphy homicide for “lower bail” on his cases. The terms for entertaining such a “deal” were clearly explained to the caller, first by Detective O’Neill and repeatedly thereafter by ADA Shapiro. It was their position that no deal could be arranged until the caller disclosed his identity, the nature of his pending cases and his information concerning the Murphy homicide. The caller was told that he could have an attorney act on his behalf if he did not wish to disclose his identity immediately. However, he never complied with those terms, obviously fearing, and justifiably so, that if he revealed his identity before a deal was arranged he would lose his bargaining strength. Faced with a situation in which an anonymous caller, although seemingly represented by counsel, claimed to have information regarding an un *891 solved homicide, the police and the ADA admirably refrained from questioning the caller regarding his substantial knowledge of the homicide, while continually encouraging the caller to have an attorney contact them on his behalf.
While the Rogers case is clearly distinguishable upon its facts, that clarity has been somewhat dissipated by language contained in a footnote in that decision (48 NY2d 167, 173, n 2, supra). I do not find that the footnote in question requires suppression of the telephonic conversations. That footnote provides: “Contrary to the suggestion of the dissent, this holding creates no undue impediment to the investigation of criminal conduct unrelated to the pending charge. An accused represented by counsel may still be questioned about such matters; we hold simply that information obtained through that questioning in the absence of counsel may not be used against him. Thus, the police may continue to obtain information from a defendant who is a mere witness to unrelated events.”
Although at first blush the footnote appears to have relevancy to this case, I find that upon close analysis it holds no more than if the police speak to a witness who is represented by counsel in an unrelated matter, nothing said by the witness with regard to the unrelated matter may be used against him in that matter, whether he blurts it out or whether it is obtained from him as the result of direct questioning or subtle suggestion.
As noted, the Rogers case dealt with a defendant in custody who was represented by counsel in an unrelated case. The reference to a witness not in custody appears only in the footnote in question. It would take a quantum leap in the law to go from the proposition that a defendant in custody who has counsel on unrelated matters may not be questioned in the absence of counsel to the proposition that statements made by a witness not in custody who has counsel in unrelated cases may not be used against the witness in the case in which he was thought to be merely a witness. Such a leap would be made as the result of closely reasoned analysis and not in an offhand observation in a footnote. There is nothing in that footnote or the accompanying textual material to lead one to believe that the Court *892 of Appeals was even considering the situation of a witness who had potential criminal liability in the case in which he was a witness. It seems to me that the court was clearly referring to a witness who did not have criminal liability in the case in which he was simply a witness, but did have criminal liability in the case in which he was represented by counsel. The footnote follows shortly after the following observation by the court (48 NY2d, at p 173): “it is the role of defendant’s attorney, not the State, to determine whether a particular matter will or will not touch upon the extant charge. Once a defendant has an attorney as advocate of his rights, the attorney’s function cannot be negated by the simple expedient of questioning in his absence.” The quoted language indicates that the fear of the court was that in situations in which police question persons who are represented by counsel in unrelated cases, they may avail themselves of the opportunity to question the witness in a • way that causes him to implicate himself in that unrelated case. Here, I find that the police and prosecution acted in good faith and had neither interest nor intention to have the caller inculpate himself with respect to his pending Bronx case or cases.
Recognizing, as has been noted, that he was not in fact in custody in this case, defendant also relies upon People v Skinner (52 NY2d 24, supra). That case stands for the proposition that if the right to counsel has attached, even noncustodial questioning is barred. In Skinner, a defendant represented by an attorney was encouraged by a police officer, in a noncustodial setting, to confess to the crime in the very case in which he was so represented.
In People v Albro (52 NY2d 619), the court declined to pass on the question whether Skinner (supra) applied to a Rogers-type situation. I note that the careful language in Skinner makes it unlikely that such holding was in fact intended to apply to a case in which defendant has counsel in an unrelated case.
As the Court of Appeals observed in People v Ferrara (54 NY2d 498, 508), critical to its decision in Skinner (supra) “was that the defendant was represented on the very matter about which he was questioned, a past crime.” In Ferrara the court declined to extend Skinner to the facts *893 before it, holding that the defendant’s right to counsel was not violated when, after he retained counsel in connection with his appearances before a Grand Jury investigating fraud in the nursing home industry, the prosecutor arranged to record defendant’s conversations with a nursing home operator in a noncustodial situation during which he offered that operator a kickback. The court concluded (p 508) that the right to counsel “rule’s salutary function cannot be distorted to immunize one represented by an attorney against investigative techniques that capture a new crime in progress” (see, also, People v Schwimmer, 85 AD2d 549).
The foregoing indicates that it is unlikely that Skinner will be extended to those cases in which a defendant has counsel in unrelated cases. In any event, I find that Skinner (supra) does not apply here because, in fact, the defendant was never questioned by Detective O’Neill or ADA Shapiro about his involvement in the Murphy homicide. No effort was ever made by them to elicit an inculpatory statement from him. Instead, they were engaged in a good faith effort to determine whether the anonymous caller had information sufficient to work out a “deal” for himself, a “deal” which, as far as they knew, involved a quid pro quo relating not to the Murphy homicide, but to pending matters in Bronx County.
Accordingly, I find that statements made by the defendant during this period are admissible, as is the unsolicited letter sent by him.[5]
The third period consists of the three calls made to ADA Shapiro between April 4 and April 14/15. Prior to the call of April 4, 1980, ADA Shapiro had received the letter which indicated that the caller, in fact, had criminal liability in the Murphy case. Upon the receipt of that letter, the status of the caller changed from that of a mere witness to that of a suspect in the Murphy homicide. Despite the fact *894 that ADA Shapiro’s perception of the caller’s status changed, I find that defendant’s right to counsel was not violated by the next three telephone calls.
The facts of this case are highly unusual. Upon receipt of the letter from the caller, his right to counsel could arguably be thought to have attached, as he was by then a suspect in one case who was apparently represented by counsel in pending unrelated cases. Here, however, the prosecutor who was receiving the calls was unaware of the caller’s identity.
During the telephone calls received by ADA Shapiro after his receipt of the letter, he scrupulously avoided asking the caller any questions which could implicate , him in either the Murphy homicide or his pending Bronx cases. Instead, ADA Shapiro asked questions which has as their object only the identification of the caller.
A suspect in a crime has no right to anonymity. Consequently ADA Shapiro was free to take pedigree information from the caller to the extent that he was able to do so (cf. People v Rogers, 48 NY2d 167, 173, supra; People v Ryff, 27 NY2d 707; People v Rivera, 26 NY2d 304). In this case he sought to obtain such pedigree information about the caller by the only means available to him. For example, he elicited from the caller the fact that he had been sentenced to a term of 4 to 8 years. That information, as well as other information elicited which did not pertain to the Murphy homicide, enabled ADA Shapiro, in fact, to identify the caller as defendant Floyd Cowart.
The situation confronted by ADA Shapiro may be analogized to one in which the police arrest an individual whose identity is unknown at the scene of a crime, and in which that individual, in response to Miranda warnings, asserts his right to remain silent. In such a situation, notwithstanding the fact that the suspect’s right to counsel has indelibly attached, the police are free to obtain pedigree information from him. The police may have that person fingerprinted in order to ascertain his identity and his prior criminal record and may inquire with respect to his name and address. Indeed, if a defendant is arrested on a felony charge he must be fingerprinted prior to the fixation of bail (CPL 530.20, subd 2, par [b], cl [ii]).
*895 Accordingly, I find that defendant’s statements made during this period are admissible as the prosecutor was attempting to do no more than obtain pedigree information by the only means then available to him.
The fourth period consists of the last seven calls made to ADA Shapiro between April 17 and May 22,1980.1 find that as of April 17 defendant’s right to counsel had fully attached and, as a consequence, all subsequent statements made by him must be suppressed as the caller could not thereafter waive his right to counsel in the absence of counsel. At that time the caller was not only known to be incarcerated on Rikers Island, but his identity was known, as was the actual nature of his pending cases. He was thus, for all practical purposes, in actual custody. Moreover, any subsequent questioning of the caller could no longer be justified on the previously legitimate rationale that his identity was being sought. Thus, while I recognize that there was a valid prosecutorial reason to continue speaking to the defendant when he called (not to make him aware that the prosecutor knew or believed that he knew who he was, thereby creating the possibility that potential codefendants could be alerted by the caller to flee the jurisdiction), I find that the violation of his right to counsel prohibits the admission of statements made by defendant during this period.
Accordingly, the branch of defendant’s motion which seeks to suppress statements is granted as to the telephone calls made during the period from April 17, 1980 to May 22, 1980 and is otherwise denied. The branch of defendant’s motion which seeks suppression of the letter is denied.

. Defendant concedes that his arguments in favor of suppression have no application to the telephone calls of October 17, 1979.

. The attorneys named by the caller were not contacted by the People. However, in fact neither of them then represented the defendant.

. During the conversation on April 2 the caller had indicated that the shooter in the Murphy homicide was to be sentenced to probation in The Bronx on that day.

. As of April 21, ADA Shapiro had received confirmation that the gun seized pursuant to the arrest of Mr. Cowart, Mr. McFarlin and Mr. Verley matched the weapon used to murder Mr. Murphy. Additionally, he knew at that time that Mr. Cowart was the only one of the three incarcerated on Hikers Island.

. The defendant’s contentions with respect to the letter are derivative. He correctly contends that if the conversations during the period in question took place in violation of his right to counsel, the letter would have to be suppressed as the fruit of those tainted conversations. I reject the defendant’s suggestion that the letter was sent in response to subtle suggestion by Detective O’Neill. If such suggestion was made it was so subtle that it has completely eluded me.