THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v
DENNIS MARSHALL, Respondent.

Second Department, January 16, 1984

**APPEARANCES OF COUNSEL**

*Carl A. Vergari, District Attorney* (*Maryanne Luciano*
and *Gerald D. Reilly* of counsel), for appellant.

*Stephen J. Pittari* (*Neal D. Jacobs* of counsel), for respondent.

**OPINION OF THE COURT**

MOLLEN, P. J.

This appeal concerns the admissibility of a confession
which, although given after *Miranda* warnings (see *Miranda v Arizona,* 384 US 436), was suppressed because the
defendant's voluntary waiver of counsel was not made in
the presence of an attorney. The appeal calls upon us to
apply the holdings of a series of cases by which our Court of
Appeals has progressively expanded a suspect's right to
counsel during police interrogation. The defendant here,
relying on those holdings, succeeded in having his confession suppressed essentially because in a prior case he had

failed to pay a fine by the date designated by the court. We turn first to a brief review of the facts.

On December 23, 1980, in the City of Peekskill, an elderly woman was accosted by a knife-wielding assailant who stole her handbag. In the course of the mugging, the woman sustained knife wounds and a broken nose. She was unable to provide the police with any description of her attacker.

When officers searched the area, they recovered the woman's purse. They also found a knife from which they were able to lift fingerprints. Sometime later, the police received information from an anonymous caller that a black man, wearing a three-quarter length gray coat, was searching the bushes at the spot where the purse and the knife had been discovered.

On or about January 7, 1981, Detective Mark O'Buck, who had been involved in the investigation of the mugging, saw defendant Dennis Marshall walking on the street. O'Buck knew the defendant by name as a witness in a homicide case, but did not know whether he had a criminal record. The detective noticed that the defendant was wearing a three-quarter length gray coat.

The same day, O'Buck, who knew that fingerprints had been found on the knife, decided to submit for comparison the prints of persons who he believed were "capable of committing such a crime". Consequently, he went through the files of the City of Peekskill Police Department, choosing appropriate fingerprint cards.

Solely because he had seen the defendant earlier that day wearing a coat matching the one described by the anonymous caller, the detective checked to see whether there was a police file on the defendant. He discovered that there was a file, indicating that the defendant had been previously arrested by the Peekskill police. O'Buck decided to send the defendant's fingerprint card, along with the others he had chosen, to the laboratory for comparison. He later received a report that the defendant's fingerprints showed similarities to those found on the knife. It was suggested that a palm print be secured for further comparison.

Notwithstanding the request for a palm print, Detective O'Buck took no further action in the matter until February 10, 1981, when he was informed that the defendant had been arrested on a new and unrelated charge. The detective immediately went to the precinct where he encountered the defendant and advised him of his *Miranda* rights. The defendant waived his rights and confessed to the mugging.

After the defendant was indicted for robbery in connection with the mugging, he moved, *inter alia,* for an order suppressing the confession on the ground that: "The defendant was represented by counsel on a pending case when he was arrested by the same police department for the charges which comprise this indictment. Therefore the defendant cannot waive [*sic*] his right to counsel except in the presence of counsel * * * Clearly the police had actual knowledge of the defendant's pending charge as well as the fact that he was represented by counsel."

Significantly, the defendant did not argue, nor does he contend on appeal, that his arrest on February 10, 1981, on the new and unrelated charge, affected the admissibility of his confession. There is no suggestion in the record that he had requested counsel on that charge or that counsel had entered the proceedings. Indeed, when Detective O'Buck approached him at the precinct, the defendant was merely waiting to be processed. Instead, the defendant's challenge was based entirely upon the assertion that, at the time of the confession, he was still represented by counsel in a criminal case which had been commenced prior to the mugging and which had been terminated by the imposition of a sentence of a conditional discharge and a $100 fine.

At the suppression hearing, the People called Detective O'Buck. His account of the investigation and of the circumstances surrounding the confession has been previously detailed herein.

The defendant called Lynette V. Spaulding, who testified that on October 27, 1980, as a staff attorney for the Legal Aid Society of Westchester County, she had been assigned to represent the defendant on a charge of criminal possession of a forged instrument in the second degree. On December 15, 1980, that charge was disposed of when the

defendant pleaded guilty to petit larceny. He was sentenced on the same day to a conditional discharge and a $100 fine. The Judge gave him until January 15, 1981 to pay the fine and said that, if he did so, he would not be required to appear in court again. The Legal Aid case folder was thereupon marked "closed". No notice of appeal was filed.

The defendant, however, did not pay the fine by the designated date and, consequently, the case appeared on the court calendar on January 15, 1981. Ms. Spaulding appeared in court but the defendant did not. The case was adjourned to January 26, 1981, and Ms. Spaulding sent a letter to the defendant.

On the adjourned date, both the defendant and Ms. Spaulding appeared. The fine had still not been paid, and an adjournment was granted to February 9, 1981. Ms. Spaulding appeared on that date, but again the defendant did not. The case was adjourned to February 23, 1981, but by then the defendant had been arrested on the new charge which led to his contact with Detective O'Buck.

Ms. Spaulding testified that she appeared for the defendant in connection with the unpaid fine on February 23, 1981, on March 10, 1981, and on March 30, 1981. On the last date, it was announced that someone had paid the fine on the defendant's behalf.

At the suppression hearing, a major portion of Detective O'Buck's examination was directed at the extent of his knowledge of the defendant's prior arrest for criminal possession of a forged instrument. Indeed, the Judge himself closely questioned the detective on that subject. In pertinent part, the record reveals the following:

THE WITNESS: On or about January 7th. I observed him walking through the downtown area, and he was wearing a gray three-quarter length coat. So, what I did is I pulled his fingerprints along with numerous other sets of fingerprints just to send down to the laboratory for a comparison. He was not a suspect at the time. We were just basically — it was a shot in the dark.

THE COURT: What I'm asking, how were you able to pull his fingerprints?

THE WITNESS: How?

THE COURT: Yes. You knew that he had been arrested prior to this, so you pulled his fingerprints?

THE WITNESS: Yes.

THE COURT: Because you didn't have any fingerprints to compare it with?

THE WITNESS: Your Honor, what I did, when I saw Dennis Marshall on the street, I went into our files to see if he did have fingerprints on file.

THE COURT: What did the files reveal about him?

THE WITNESS: What did the files reveal about him?

THE COURT: Yes.

THE WITNESS: I didn't look in that file. All that is in there is a Rap Sheet and photograph.

THE COURT: What did the Rap Sheet reveal about him?

THE WITNESS: I didn't look at it.

THE COURT: You mean you just went into the file and didn't look at it?

THE WITNESS: He wasn't a suspect at the time.

THE COURT: You said you were investigating him and you observed him, isn't that correct?

THE WITNESS: Investigating him?

THE COURT: You saw him walking down the street in a three-quarter length coat, so you thought he was a suspect, is that right?

THE WITNESS: Technically, yes.

THE COURT: Therefore, you went to a file to find out what you could about that individual, is that correct?

THE WITNESS: I went to the file for the fingerprint card.

THE COURT: You mean you just went blind and didn't look at anything except the fingerprint card?

THE WITNESS: I went through many files for the specific purpose of sending fingerprints down * * *

THE WITNESS: Your Honor, all I was doing at that time, was sending fingerprint cards down. I looked to see if they were, in fact, Dennis Marshall's fingerprints. I simply put them in an envelope with other sets of fingerprints and sent them to the lab.

## Detective O'Buck further testified as to a conversation he had had with the defendant about the prior arrest:

A We were just talking at the time. I believe I was taking his photograph, and I asked him at that time what he had been arrested for in Peekskill previously, and he said foregery [sic]. I said — I asked him what happened as a result of that case. I asked what did he get out of that. He said "I got a fine"
* * *

Q Let me follow up on this. You said approximately 3:00 o'clock you had a conversation when taking the defendant's picture, is that correct?

A Yes.

Q As best you can recollect, did you initiate the conversation?

A I believe I did, yes sir.

Q Could you just give us, as best you can recall, what you said?

A Okay. Basically, I said — I don't remember word for word again, but I said, "I know you've been arrested in Peekskill before. What was it for?"

Q What, if anything, did the defendant say?

A He said "Foregery [sic]." I said, "How did you make out on that?" He said, "I got a fine."

Q He said "I got a fine"?

A Yes. He said, "I didn't pay it yet." So, I looked at him and said, "When was this case?" and he said "Last year." I said, "You haven't paid the fine yet?" He said "No." At that point, I asked if the District Attorney upstairs —

Q I am not asking you anything about that, Detective. I'm just asking you whether or not the defendant Dennis Marshall ever said that he had an attorney in the prior situation.

A Well, I didn't ask him it [sic] he had an attorney. I knew if he was arrested for foregery [sic], that he would have had to have an attorney.

Q But he never so stated to you, did he?

A No.

Q And this conversation took place after the confession by the defendant?

A That's correct.

At the conclusion of the hearing, Criminal Term suppressed the confession, holding that it was obtained in violation of the defendant's right to counsel. The court in essence reasoned that, given Detective O'Buck's awareness that the defendant was previously arrested on a forgery charge, and would therefore have had counsel, a basis existed for imputing to the detective knowledge that the defendant had counsel when he confessed. The court also rejected the argument that the defendant's right to counsel terminated when defendant was sentenced on the forgery charge, almost two months before the confession on the instant charge. We reverse.

The right to counsel, guaranteed by section 6 of article I of the New York State Constitution, has, in the last 20

years, experienced a "rich development" (*People v Blake,* 35 NY2d 331, 338), and, owing to "[o]ur special solicitude for this fundamental right" (*People v Cunningham,* 49 NY2d 203, 207), its protections have been extended beyond those of its Federal counterparts found in the Fifth and Sixth Amendments (*People v Hobson,* 39 NY2d 479, 483-484; *People v Blake, supra,* pp 335-336). Insofar as relevant to the case at bar, the development of these additional protections may be briefly summarized.[1]

In *People v Arthur* (22 NY2d 325, 329), the Court of Appeals made explicit that which was implicit in *People v Donovan* (13 NY2d 148, 151) concerning New York's constitutional guarantees of due process, the privilege against self-incrimination, and the right to counsel: "Once an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, in the presence of the attorney, of the defendant's right to counsel * * * There is no requirement that the attorney or the defendant request the police to respect this right of the defendant."

An exception to the *Arthur* "nonwaivability" rule (see *People v Skinner,* 52 NY2d 24, 28-29) was recognized in *People v Hetherington* (27 NY2d 242) and *People v Taylor* (27 NY2d 327), which exception permitted law enforcement officers to question the accused in the absence of a request for counsel, notwithstanding that he was represented on an unrelated matter. In *People v Hetherington* (*supra,* p 245), then Chief Judge FULD wrote: "Quite obviously, the fact that the defendant may have been represented in the past by an attorney in some unrelated case is, for present purposes, beside the point. In light of *People* v. *Arthur* (22 NY2d 325, 329, *supra*) * * * further questioning of an accused in the absence of counsel is proscribed only after the police learn that 'an attorney [has] enter[ed] the proceeding' in connection with the charges under investigation * * * It follows, therefore, that, since the defendant did not have an attorney representing him in this case —

---

1. The defendant's Federally guaranteed right to counsel (see *Gideon v Wainwright,* 372 US 335), is not implicated because adversary judicial proceedings on the robbery charge had not been initiated when he was interrogated by Detective O'Buck (see *Kirby v Illinois,* 406 US 682 [plurality]; *People v Hawkins,* 55 NY2d 474, 482-483; cf. *Brewer v Williams,* 430 US 387).

or desire one — there was no violation of his right to counsel, and his statements were properly received in evidence."

After a period of some uncertainty (see *People v Robles,* 27 NY2d 155, cert den 401 US 945; *People v Lopez,* 28 NY2d 23, cert den 404 US 840; *People v Wooden,* 31 NY2d 753), the Court of Appeals, in *People v Hobson (supra),* reaffirmed its commitment to *Arthur (supra)* as a matter of State constitutional law. Also recognized was the continued vitality of the *Taylor-Hetherington* unrelated crime exception to the *Arthur* rule (*People v Hobson, supra,* p 483).

The court's dissatisfaction with the unrelated crimes exception, however, soon became evident (see *People v Ramos,* 40 NY2d 610; *People v Carl,* 46 NY2d 806; *People v Ermo,* 47 NY2d 863). Three and one-half years after *Hobson (supra),* in *People v Rogers* (48 NY2d 167, 172), the court, noting the many cases and "variety of circumstances" in which "it has been urged * * * that the exception concerning unrelated charges was applicable", abandoned the exception and established a "bright line" test for determining the admissibility of a statement elicited by law enforcement officers from a defendant who is represented by counsel on a pending matter: "We hold today that once an attorney has entered the proceeding, thereby signifying that the police should cease questioning, a defendant in custody may not be further interrogated in the absence of counsel. We may not blithely override the importance of the attorney's entry by permitting interrogation of an accused with respect to matters which some may perceive to be unrelated." (*People v Rogers, supra,* p 169.)

The broad language of the *Rogers* holding, however, was later refined. In those instances where a suspect had been represented by counsel in an unrelated matter the fact of that representation was held to be necessary for the invocation of the right to counsel (see *People v Kazmarick,* 52 NY2d 322; *People v Hawkins,* 55 NY2d 474, 484, n 3), but, standing alone, it was not deemed sufficient. Instead, courts began to look to whether the police had knowledge of such representation. In *People v Servidio* (77 AD2d 191,

197, affd 54 NY2d 951), former Justice HOPKINS, writing for this court, observed: "[W]e should focus on whether the police actually had knowledge of the representation of the defendant by counsel — '[W]hat is required must always be considered in light of what is practical under the circumstances'. The balance between the rights of the individual and the responsibilities of the State will be fairly maintained if actual knowledge, not constructive knowledge, is the ingredient of the rule forbidding the interrogation of a suspect when he is represented by counsel on unrelated charges unknown to the police. This does not mean that the police may act by subterfuge to conceal such knowledge, or to overlook the obvious. Equally, it means that the police undertaking the questioning must be possessed with the knowledge of the prior representation."

The Court of Appeals subsequently held, however, that even where the officer does not have actual knowledge of representation his knowledge of a suspect's prior arrest gives rise to a duty to inquire. In *People v Bartolomeo* (53 NY2d 225, 231-232), the court wrote: "Knowledge that one in custody is represented by counsel, albeit on a separate, unrelated charge, precludes interrogation in the absence of counsel and renders ineffective any purported waiver of the assistance of counsel when such waiver occurs out of the presence of the attorney * * * The same consequence flows from knowledge, such as that possessed by * * * [the detectives] here, that the defendant has been arrested only seven days earlier by means of the same police department on an arson charge, if in fact the defendant has counsel on the earlier charge. This follows naturally on the awareness on the part of law enforcement personnel of judicial concern for, and protection of, a criminal defendant's right to the aid of counsel at every critical stage of proceedings against him. Hence, the interrogating detectives here, with actual knowledge of the outstanding arson charge against defendant, were under an obligation to inquire whether defendant was represented by an attorney on that charge. Having failed to make such inquiry, the officers were chargeable with what such an inquiry would have disclosed — namely, that defendant did have an attorney acting on his behalf. With such knowledge they were

foreclosed either from questioning defendant or from accepting his waiver of counsel's assistance unless his attorney was then present".

And, again in *People v Smith* (54 NY2d 954), the Court of Appeals ordered suppression of the defendant's statements, holding (pp 955-956): "There is no question that the officer who questioned defendant knew that defendant had been arrested eight months earlier on a sodomy charge by the same police department. Indeed, the officer testified that he assumed that defendant had an attorney on that charge. Since he had actual notice, the officer was 'under an obligation to inquire whether defendant was represented by an attorney' on the earlier charge".

Most recently, in *People v Fuschino* (59 NY2d 91, 98) the court summarized the law in *Rogers*-type cases: "When a defendant's right to counsel has attached in a prior, unrelated charge, and the police know that it has attached, they may not question the defendant without his attorney being present * * * They are further obligated if they have actual knowledge that defendant has prior, unrelated charges still pending against him to inquire whether defendant has counsel in that case * * * If they fail to inquire, the police are 'chargeable with what such an inquiry would have disclosed' * * * Thus, to decide this appeal, we must determine whether the State Police had actual knowledge that defendant was represented by counsel in a pending unrelated matter or that they had actual knowledge of the pending charges against defendant so that they were under an affirmative duty to inquire as to whether or not defendant was represented by counsel."

We are, of course, bound to follow the rulings of the Court of Appeals. In this case, Criminal Term suppressed the defendant's confession essentially because it believed that Detective O'Buck should have learned that defendant was being represented by an attorney in a postconviction proceeding. That proceeding was not remotely concerned with the defendant's innocence or the vindication of his rights, but, rather, was made necessary by the defendant's failure to pay a fine imposed in an earlier unrelated matter considered by his attorney to be "closed". The defendant would have us hold that, because of this failure, he was

insulated from otherwise legitimate police interrogation, despite his having been given the *Miranda* warnings and his waiver of his right to counsel. Such a result is understandably troubling.[2] We reverse here because we conclude that *Rogers* (48 NY2d 167, *supra*) and its progeny do not require suppression under the circumstances at bar.

Notwithstanding Detective O'Buck's testimony that he gave the defendant's file only a cursory glance, we agree with Criminal Term that the detective must be held to have had knowledge of the contents of the file, viz., that the defendant had been arrested by the Peekskill police on October 23, 1980, for criminal possession of a forged instrument. Possessed of such knowledge, Detective O'Buck was obligated to make further inquiry, and was chargeable with what such inquiry would have disclosed (see *People v Fuschino, supra,* p 98, and cases cited therein).

The detective did not make inquiry prior to eliciting a waiver of rights, but he did inquire as to the status of the prior case immediately after the confession. However, there can be no better way of determining what a timely inquiry would have disclosed than by examining what the actual inquiry did in fact disclose. As a result of that inquiry, the detective learned that the defendant had been arrested for forgery. He then asked, "How did you make out on that?" The defendant replied, "I got a fine", and subsequently added that the fine had not yet been paid.

Clearly, the defendant's response could reasonably have led the detective to conclude that the prior unrelated matter was no longer pending and that the defendant was not then represented by counsel (see *People v Mann,* 60 NY2d 792, 794; *People v Baldi,* 96 AD2d 212). Moreover, the detective's subsequent discovery that the fine had not

---

**2.** A person who is arrested for the first time may waive his *Miranda* rights and make a statement to police in the absence of an attorney even though his lack of previous involvement with the law would suggest that he may not be fully aware of the value of the assistance of counsel at the interrogation stage. In contrast, a repeat offender, whose experience has presumably taught him the value of counsel and who nevertheless voluntarily chooses to waive his *Miranda* rights and confess, may not do so in the absence of counsel if he is known to have been previously arrested on an unrelated charge and inquiry would reveal that he is in fact represented by counsel on that charge.

Had the defendant paid the fine, or had the proceeding been terminated prior to his interrogation, representation undoubtedly would be deemed to have been terminated, thereby unquestionably permitting the defendant to waive his rights in the absence of counsel (see *People v Kazmarick,* 52 NY2d 322, *supra*).

yet been paid did not, in our view, require him to make further inquiry. The detective's primary task was to investigate the robbery in question, not to launch an intensive investigation into the status of the defendant's prior criminal cases.

Although the police may not overlook the obvious or avoid knowledge of legal representation through subterfuge (*People v Servidio, supra*), it is entirely unreasonable to suggest that they are somehow obligated to undertake a full investigation to determine whether a suspect, who casually remarks that he has not yet paid a fine imposed in a prior closed case, is represented by counsel in a postconviction proceeding (cf. *People v Lucarano*, 93 AD2d 840). Rather, the police are entitled to end their inquiry when they are reasonably led to believe that the only prior case about which they have knowledge has been terminated by conviction and the imposition of sentence (see *People v Fuschino*, 59 NY2d 91, *supra; People v Smith*, 54 NY2d 954, 956-957, *supra* [WACHTLER, J., dissenting]). We hold, therefore, that, under the circumstances at bar, where a reasonable and sufficient inquiry did not result in disclosure of the fact that the defendant was represented by counsel in an unrelated matter at the time he was being interrogated, his waiver of *Miranda* rights in the absence of counsel was effective.

Accordingly, that branch of the defendant's motion which sought suppression of his confession should be denied, and the case should be remitted to Criminal Term for further proceedings.

TITONE, WEINSTEIN and RUBIN, JJ., concur.

Order of the Supreme Court, Westchester County, dated May 10, 1982, reversed, on the law, that branch of defendant's motion which sought to suppress certain statements given to the police denied, and matter remitted to Criminal Term for further proceedings.