OPINION OF THE COURT
Eve Preminger, J.
Do the rights afforded an individual by Massiah v United States (377 US 201) and People v Hobson (39 NY2d 479) ever expire? The defendant argues that an incarcerated person never loses his right to counsel once it has attached and that admissions made to informants while in prison which link him to a string of contract murders are inadmissible at trial.
FINDINGS OF FACT
On November 2, 1982 the defendant, admitting to schemes and swindles perpetrated against John P. Maguire and Co. and the United States Government, pleaded guilty to mail fraud and tax evasion charges in the United States District Court for the Southern District of New *1035 York. These charges stemmed from an investigation into the bankruptcy of Candor Diamond Corporation, the sole shareholders of which were defendant and his wife. Among the accusations was that Candor had defrauded creditors of over $5,000,000.
Sentenced to a 28-year prison term, defendant began serving his sentence at the Metropolitan Correctional Center (MCC) on December 10, 1982, where he remained through February, 1984. After conferring with an attorney named Gary Woodfield, who had represented him on the criminal charges in Federal court and with Benson Weintraub, who had represented defendant’s wife in the same matter, defendant decided not to file a notice of appeal and not to attack his conviction collaterally. He did, however, file an application to reduce his sentence pursuant to rule 35 of the Federal Rules of Criminal Procedure which was denied on May 26, 1983.
Between December 10,1982 and June 2,1983 defendant also discussed with the two attorneys the possibility of obtaining habeas corpus relief, his rule 35 application, and the murder trial of one Donald Nash which was (in April and May of 1983) then taking place in New York State Supreme Court.
Mr. Nash was charged with conspiring to murder two employees of Candor named Jenny Soo Chin and Margaret Barbera, and with the murders on April 12, 1982 of Barbera and three CBS employees who had been nearby when Barbera was shot. These crimes were highly publicized as the “CBS killings”, and defendant was labeled in the press as the “mastermind” behind them. The trial of Nash resulted in his conviction on May 24, 1983.
While defendant had not been formally charged with complicity in these crimes, he was aware that law enforcement officials suspected that the execution of Barbera, who was scheduled to testify against him in the Federal Grand Jury, and the abduction and presumed murder of Barbera’s close friend Chin, had been upon his command.* Indeed, in *1036 the hope of garnering evidence of defendant’s guilt, Federal and State authorities were continuing a joint investigation. Their hopes were realized when the recently incarcerated defendant began to discuss the killings with fellow inmates, three of whom became informers against him.
The first of these, Vincent Calise, was sent to the MCC from another Federal facility on December 2, 1983. Calise became acquainted with the defendant shortly after defendant was fortuitously placed on the same floor of the institution. Defendant made statements to Calise concerning the murders of Barbera, Chin, and the three CBS employees almost as soon as he arrived and Calise, who had been an informant in an unrelated case, contacted FBI agent Levinson with whom he had previously worked to reveal what he had learned. Somewhat surprisingly, Agent Levinson and his superiors at first neither explicitly nor implicitly encouraged Calise to draw defendant out about the murders. This situation soon changed.
On January 5, 1983 defendant allegedly asked Calise how much it would cost to murder David Blejwas, a lawyer who had been particularly aggressive in ferreting out defendant’s assets during the bankruptcy proceeding. Reporting the inquiry to Levinson and Assistant United States Attorney Ira Block, Calise was asked on January 10 to elicit information concerning a plot to murder the attorney. At the Government’s instruction and up and until May 19, 1983, Calise repeatedly engaged defendant in conversation about Blejwas, taping some of the discussions. Admissions regarding the CBS murder case were also elicited during this period. The second person in contact with defendant was Harry Adair, who was incarcerated at the MCC from December 28,1982 until January 24, 1983, when he was paroled to a halfway house in New Jersey. As garrulous with Adair as he was with Calise, defendant allegedly agreed to pay Adair $15,000 to murder Blejwas and made several admissions concerning his role in the deaths of Chin and Barbera.
On February 1, 1983, the FBI, who knew nothing of Adair’s conversations with defendant until they were informed of them by Calise, approached Adair. He told them that defendant had hired him to kill Blejwas and that he *1037 had already been paid an advance on the $15,000 agreed upon price. Adair also agreed to cooperate with the investigation into defendant’s previous criminal activities including the murders of Chin and Barbera. To this end Adair visited the defendant at the MCC on February 10, March 17 and March 23, 1983 and recorded conversations with him.
The last of the three informants arrayed against defendant was Eugene Peetz, who was incarcerated at the MCC from April 2, 1982 until August 30, 1983. Unlike Calise and Adair, Peetz was specifically instructed to milk admissions from defendant concerning the CBS case from the very beginning and attempted to do so from defendant’s first few days in the institution. Ironically, although he had spoken freely with Adair and Calise, defendant refused to discuss the CBS case with Peetz. Peetz was, however, twice able to overhear defendant comment to other inmates that if Donald Nash were convicted, he (defendant) would be in “big trouble”. Peetz did not initiate or participate in the conversations in which these statements were made.
In July of 1983, Peetz had discussions with defendant and his attorneys regarding Harry Adair. Defendant, outside the presence of these attorneys, solicited Peetz to discredit Adair at any trial by offering perjurious testimony concerning Adair.
All of these contacts with defendant were made known to the New York State authorities, who were continuing their investigation of defendant’s role in the murders.
On June 2, 1983, the defendant was arrested and charged in a Federal complaint with hiring Adair to murder Blejwas. This was the first charge brought or to be pending against defendant since December 10,1982, when he was sentenced in Federal court. At the time of his arraignment, defendant informed the United States magistrate that he was not represented by counsel, and an attorney was appointed for him.
On July 15, 1983 a New York County Grand Jury voted the instant indictment, which charged defendant with the murders of Barbera and Chin, and with conspiring to murder Barbera, Chin and Blejwas. The indictment was *1038 based in part on the admissions made by defendant to the three inmates.
CONCLUSIONS OF LAW
The People seek to introduce defendant’s statements to the three inmates as part of their direct case. Defendant argues that these disclosures were obtained in violation of his right to counsel and has moved to suppress.
The practice of enlisting a defendant’s cellmates to pump him for information is a constitutionally precarious one. Massiah v United States (377 US 201, supra) established that the government may not use undercover agents or informants whose role is unknown to the defendant to elicit incriminating statements from an indicted defendant. To do so violates the Sixth Amendment because defendant is entitled to the presence of counsel during any questioning. (See, also, United States v Henry, 447 US 264.)
Within the last few years New York has markedly broadened the reach of the Sixth Amendment. Its protection from questioning in the absence of counsel now extends to defendants who are not in custody (People v Skinner, 52 NY2d 24), as well as to those who are (People v Hobson, 39 NY2d 479, supra), to those who have counsel on other matters (People v Rogers, 48 NY2d 167), and to some who are yet to retain counsel (People v Samuels, 49 NY2d 218; People v Settles, 46 NY2d 154).
While the right to counsel is extremely broad, it is far from infinite, even in New York. One of the few remaining limitations pertains to ongoing or future crimes. The right not to be questioned in the absence of an attorney does not extend to situations in which a criminal enterprise is being planned or executed (People v Ferrara, 54 NY2d 498, 505-506) and the use of undercover agents or informants to investigate a crime prior to its commission does not violate constitutional guarantees (United States v Henry, 447 US, at p 272). Thus, where defendant solicits kickbacks (People v Ferrara, supra), offers a bribe (People v Middleton, 54 NY2d 474) or attempts to suborn perjury (People v Mealer, 57 NY2d 214), the statements he makes to the police or their agents are admissible against him as long as the statements were made “in response to inquiry legitimately *1039 related” to the new crime (People v Middleton, supra, at p 482).
It is for this reason that those of defendant’s statements to C alise and Adair concerning the proposed murder of attorney Blejwas are admissible at trial. Once alerted to the existence of a murder conspiracy, the authorities were justified in instructing their agents to discover as much as possible from its prime mover. The discussions held by these two informants with defendant at the behest of the FBI were thus in legitimate investigation of a crime then being planned.
The same analysis holds for defendant’s statements to Peetz concerning Adair. Solicitations of perjury are also not protected by the Sixth Amendment.
Requiring little discussion are the statements which were overheard by Peetz that defendant would be in “big trouble” if Nash were convicted. Although Peetz was a government agent beginning on December 10, 1982, these statements are admissible because Peetz did not do anything to elicit them. Statements spontaneously made or provoked by third parties which are merely overheard by the police or their agents may be used against the defendant regardless of whether a right to counsel has attached. (People v Rivers, 56 NY2d 476; United States v Henry, 447 US 264, supra.)
The use at trial of defendant’s statements pertaining to the CBS murders presents different issues. The shooting of Barbera and the disappearance of Chin occurred long before defendant began to talk to C alise and Adair. In contrast to discussions of future crimes, admissions by a defendant of his participation in past crimes must comply with Sixth Amendment strictures.
In the instant case the statements which connect defendant to the CBS killings fall within two categories:
The first are the statements made to C alise before January 5, 1983 and to Adair before February 10, 1983. These early statements are admissible because neither Calise nor Adair can be considered agents of the authorities until after these respective dates.
*1040 Although the police may not engage in interrogation in the absence of counsel (People v Lanahan, 55 NY2d 711) and may not achieve indirectly, through agents, what they are forbidden to do themselves (United States v Henry, supra), not every informant is an agent of the police (United States ex rel. Milani v Pate, 425 F2d 6, cert den 400 US 867). Where an informer works independently, providing information on his own initiative, he is merely a private citizen whose information, however learned, may be used without violating the Sixth Amendment (People v Cardona, 41 NY2d 333; Paroutian v United States, 370 F2d 631).
There can be little doubt that Calise and Adair scented gain in defendant’s loquacity and that they reported his revelations not out of a sense of civic duty but in the hope of accruing some future benefit. Self-interest does not, however, invest an informer with the status of government agent since “[t]he motivation to inform comes from the informer and not from the government” (People v Cardona, supra, at p 335).
There is no evidence that the government urged or encouraged Calise or Adair to elicit information from defendant during this period. Pure chance lay behind their encounters in the MCC and fostered intimacy between them. The defendant now seeks protection from his own garrulity and misplaced confidences, a protection the Constitution does not provide. (Hoffa v United States, 385 US 293.)
That both Calise and Adair had previously functioned as government agents does not alter the situation. Their prior efforts were in no way related to the CBS murders or the activities of this defendant and did not make them agents for the purposes of this case (People v Kinder, 75 AD2d 34). Nor does the fact that both men subsequently became agents alter their status as private individuals during the early winter of 1982 (People v Odierno, 121 Misc 2d 330). I therefore find all statements of defendant to Calise prior to January 5, 1983 and to Adair prior to February 10, 1983 admissible.
More problematic are the statements made by defendant to Calise and Adair after the two had been asked to inform *1041 on defendant by the FBI and had thus become agents of law enforcement. At first blush they would seem inadmissible. They are unquestionably statements elicited by government agents from an incarcerated defendant known to have counsel on other matters. As discussed earlier, under New York law a defendant in custody may not be questioned, provided the police know (People v Bartolomeo, 53 NY2d 225) or have reason to know (People v Smith, 54 NY2d 954) that he is represented by counsel on another matter.
With limited exception (see, e.g., People v Skinner, 52 NY2d 24, supra; People v Torres, 97 AD2d 802), this doctrine applies only to custodial interrogations. The first and most novel argument presented by the People is that defendant was not in custody when inveigled by Calise and Adair to discuss the CBS killings even though he was concededly an inmate in a Federal jail.
The People compare defendant to a suspect being questioned in his own home. Pointing to the lack of traditional indicia of custody, such as a coercive atmosphere and psychological inequality between the defendant and his interrogators, the People stress that defendant was free to begin or break off the discussions as he wished, was at ease during them, and could wander about at will.
An individual in prison is, of course, in custody in the broader sense. His movements are inflexibly regulated by the institution and he is rarely free to move outside of the confines of the prison or without escort. The question nonetheless arises whether all interrogation of such an individual necessarily constitutes custodial interrogation. In analyzing the custodial nature of prison interviews, courts generally look to the traditional tests for determining custody: “the language used to summon the individual, the physical surroundings of the interrogation, the extent to which [the prisoner] is confronted with evidence of his guilt, and the additional pressure exerted to detain him” (Cervantes v Walker, 589 F2d 424, 428), and then decide whether the prisoner would reasonably believe himself to be in custody beyond that imposed by the confines of ordinary prison life (see, e.g., People v Smith, 117 Misc 2d 737; People v Cowart, 114 Misc 2d 881). This is simply *1042 another way of applying the standard custody test promulgated by the Court of Appeals in People v Yukl (25 NY2d 585): would a person innocent of any crime reasonably believe he was free to leave (or in a prison situation, free to terminate the interview)?
Unfortunately, these tests are meaningless when the prisoner is unaware that he is being questioned by government agents. The question in such instances cannot be whether defendant reasonably believed himself free of additional custodial restraint or able to terminate the interview since he did not know a governmental inquiry was taking place. Yet, an inmate being secretly interrogated is in a unique and difficult position. Unlike a suspect in his own home, who can always close the door on his interrogators or otherwise terminate the interview, a jailed suspect can never exclude his questioners. They have been specifically placed, sometimes in defendant’s own cell (Wilson v Henderson, 742 F2d 741), so that they will have constant access to him. The prisoner can never effectively terminate the questioning because he does not know that it is taking place, and is therefore at the constant mercy of the State. To permit the authorities to interrogate an incarcerated individual on whom they have already focused by means of agents cloaked as his intimates is to afford the suspect all the protections of a fish in a fish bowl. That the defendant felt no compulsion to speak is immaterial; his interrogators had unlimited access to him and he could neither effectively evade them nor shut them out. I therefore hold that defendant was the subject of custodial interrogation when he made his inculpatory statements to C alise and Adair.
What are the consequences of defendant being in custody during his statements to the government informers? If he was represented by, or entitled to, counsel on the murder charge, their use would clearly be barred under the Hobson line of cases. However, the record demonstrates that defendant’s right to counsel on the murder charges did not attach until July, 1983, when for the first time formal murder charges were brought against him in an indictment. (People v Settles, 46 NY2d 154, supra.) Nor was defendant actually represented on the murders. Although *1043 defendant was consulting with attorney Woodfield on the fraud charges during the relevant period, Woodfield had specifically told him he would not represent him on the murder case. I reject defendant’s contention that the fraud and murder charge should be viewed as one transaction. They are clearly distinct and separate matters for Sixth Amendment purposes. Although related in terms of cause and effect they share no overlapping elements and deal with discrete events widely separated in time. The murder conspiracy was not even entered into until November,
1981, long after the fraud had ended. The two sets of charges are thus not so closely “ ‘interrelated and intertwined’” that they should be deemed as one (People v Mann, 60 NY2d 792, 794; and see People v Miller, 54 NY2d 616; People v Ermo, 47 NY2d 863; People v Smith, 62 NY2d 306). I find, therefore, that defendant was not represented on the murder charge until assigned an attorney on June 2, 1983. Nor did any right to counsel on the murder charge attach before that time. (See People v Hawkins, 55 NY2d 474; People v Wilson, 56 NY2d 692.)
Even though defendant had no attorney on the murder charge, he was consulting with Woodfield and others during the relevant period and the authorities unquestionably knew it. This would seem to place him squarely within the protection of the Rogers-Bartolomeo doctrine prohibiting questioning of an unrepresented suspect known to have counsel on other matters. Yet a thorough analysis of the reasoning and logic behind Rogers and subsequent cases leads me to conclude that the doctrine should be restricted to those situations where the unrelated representation is with respect to a case that is actually pending at the time of the interrogation. Defendant’s unrelated representation was on the fraud case which had, in my view, already terminated for Rogers-Bartolomeo purposes, with the imposition of sentence on December 10, 1982. (See Bradley v United States, 410 US 605, 609; CPL 1.20, subd 16, par [c].)
This interpretation of the Rogers-Bartolomeo rule is the only one consistent with the underlying rationale and purpose of the doctrine. When the Court of Appeals overruled prior law in Rogers, it expanded New York’s protec *1044 tion against questioning in the absence of counsel beyond that provided by the Federal Constitution or indeed, any other jurisdiction. It did so despite vigorous criticism of the ruling as unduly favorable to the recidivist offender, who is the only one likely to be represented on a prior crime and thereby the only beneficiary of the rule. (See Jasen, J., dissenting in Rogers, 48 NY2d 167, 175, supra.) The court took its expansive view to prevent what it perceived as the greater danger that a defendant who had counsel and, therefore, could not be questioned about a pending matter might nevertheless incriminate himself on that charge if questioned in the absence of counsel on an unrelated matter. (See People v Rogers, 48 NY2d 167, 173, supra.)
Thus, the Rogers rule was conceived primarily to safeguard a defendant’s right to counsel on pending charges by removing any incentive for the police to violate that right under the pretext of investigating new criminal activity. (People v Hauswirth, 89 AD2d 357, 359, affd 60 NY2d 904.) That the existence of a pending case is the linchpin of the Rogers-Bartolomeo line of cases is made clear in subsequent decisions such as People v Kazmarick (52 NY2d 322); People v Hawkins, (55 NY2d 474, supra), People v Fuschino (59 NY2d 91), and People v Lucarano (61 NY2d 138). See, also, People v Baldi (96 AD2d 212) and People v Marshall (98 AD2d 452, 462), where the courts recognize the significance of whether a prior case is still pending.
. Where a once pending charge has been concluded with a guilty plea and sentence the rationale underlying the Rogers-Bartolomeo body of precedent is inapplicable. Where, as here, the defendant has pleaded guilty, has been sentenced and has not appealed that judgment (cf. Cahill v Rushen, 678 F2d 791), he is no longer in jeopardy with respect to that case and therefore cannot incriminate himself in it when subsequently interrogated about unrelated matters.
The defendant nevertheless points out that his attorney on his Federal fraud case continued to represent him even after his sentence by filing a postjudgment motion to reduce sentence pursuant to rule 35 of the Federal Rules of Criminal Procedure. It is the defendant’s thesis that the *1045 Rogers and Bartolomeo rules are broad enough to encompass this instance of actual postsentence representation.
There are several objections to this argument. First, as has already been pointed out, the reasons which impelled the adoption of the Rogers-Bartolomeo rules are totally absent in this instance.
Furthermore, a host of unfavorable consequences would accompany the application of Rogers-Bartolomeo to the postsentence context. Practically speaking, the defendant’s situation cannot be distinguished from that of a convicted criminal who has counsel pursuing a motion to vacate a judgment, or one who has counsel making a collateral attack on the judgment. Motions to vacate judgments, coram nobis, and habeas corpus petitions can be filed years after a judgment becomes final. In view of the glacial pace of the appellate process in New York, a convicted defendant can be paroled from an indeterminate sentence before even his first appeal has been perfected, which would mean that a parolee could not voluntarily confess when arrested for a new crime simply because an attack on an old case was still in progress. To extend Rogers-Bartolomeo to the instant case would require its extension to all these analogous circumstances. To hold that a criminal suspect who has an attorney pursuing one of those remedies on a completed case cannot be questioned without counsel even in regard to unrelated matters would bar police questioning as to new and unrelated crimes virtually in perpetuity and certainly until long after investigation is likely to be fruitful. I hold, therefore, that the fact that defendant was represented by counsel on a case on which he had already been sentenced does not, under New York law, prohibit questioning regarding a new crime.
For all the foregoing reasons, defendant’s motion is denied in all respects.

 The fact that defendant had been tied to the killings was made known to the Federal court prior to the imposition of sentence on December 10,1982. Defendant later argued that the unusual length of his Federal sentence reflected an undue and unfair focus on his involvement in those crimes.